The STATE of Ohio, Appellee,

v.

TOLLIVER, Appellant.

[Cite as *State v. Tolliver* (2001), 146 Ohio App.3d 186.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 78786.

Decided Sept. 24, 2001.

188

William D. Mason, Cuyahoga County Prosecuting Attorney, *Patrick J. Lavelle* and *Edward M. Walsh,* Assistant Prosecuting Attorneys, for appellee.

*Patrick S. Lavelle,* for appellant.

ANNE L. KILBANE, Presiding Judge.

This is an appeal from a jury verdict, following trial before Judge Bridget McCafferty, finding appellant Charles T. Tolliver, Jr. guilty of conspiracy to commit the 1978 murder of Elaine Lovett. Tolliver contends that his lawyer did not provide effective assistance when he failed to seek dismissal of the conspiracy charge on statute-of-limitations grounds. We reverse and remand for determination of whether the charge was time-barred.

We glean from the record the following: In 1978, Tolliver, known to have been armed at all times with a gun and/or knife, was the bodyguard and henchman of his cousin, Andrew Fortson ("Fortson," a.k.a. Andrew Tolliver), a procurer. At Fortson's request, he had assaulted both Fortson's enemies and his prostitutes and strangled one of the women to force her to drop assault charges she had filed against his boss. Fortson himself often abused the women, at times beating them so badly that bones were broken and extended medical treatment was needed.

The victim in this case, one of Fortson's women, was five-foot tall, ninety-two-pound Elaine Lovett, a.k.a. "Sonia Cruz" or "Little Bit." On June 2, 1978, Jackie Lynn, a friend who had not seen Lovett for two days, asked Fortson about her and both of them went to Lovett's apartment. Noting Lovett's car in the garage, her kitchen curtains askew, and no answer at her door, they contacted the building superintendent, who called the Euclid police. With the police present, the door, which showed no evidence of forced entry, was unlocked and Lovett's body was found between the entrance hallway and the living room. The room itself was in shambles, with blood everywhere and the furniture slashed. There was blood on the walls, and the body lay face up in a pool of blood. She had been stabbed thirteen times, hit in the back of the head at least five times with a blunt instrument, and had been strangled with a telephone cord. A knife she carried for protection was found nearby, which tested positive for the presence of blood but was wiped clean of fingerprints.

Significantly, while the living room/hallway, bathroom and bedroom[1] areas of the apartment were in complete disarray, the kitchen was impeccably neat. Several washed dishes were in the drying tray by the sink, and nothing was out of order except for two half-empty glasses of orange drink. Six latent finger-prints were found on the glasses and examined by BCI, and only three of them were attributed to Lovett with the others unidentified.

The Cuyahoga County Coroner ruled her death a homicide and assigned strangulation and damage from several of the deeper stab wounds as the cause of death. From the condition of her body, a deputy coroner opined that Lovett had been dead between twenty-four to forty-eight hours.

Fortson was questioned and admitted that he had dated Lovett, claimed that he last saw her on the evening of May 31, and denied being involved in prostitution. He later claimed that from the evening of May 31 to June 2 he had been with Jacque Conners at the Midtown Motel and she corroborated his statement. With no eyewitnesses or other leads, the case became inactive until 1986 when Conners, then in Florida, volunteered that she had given a false statement. She told a Euclid detective that Fortson was not in the motel during

---

1. There was no furniture in the bedroom.

the early hours of June 1, 1978, and when he returned he was nervous, wearing different clothing, and repeatedly stated that he needed a witness. She claimed that her 1978 statement was made out of fear that he would kill her. The detective did not believe that he had enough evidence to proceed and, again, the case went inactive.

In 1991, Brenda Caver, another one of Fortson's women and the mother of his daughter Andee, was hospitalized because he had beaten her. She gave a statement to the Euclid police in which she stated that in 1978 she had worked for some time with Lovett in Ontario, Canada, and that Lovett was intending to leave the business and go home to New York. According to Caver, when she returned from Canada in mid-June 1978, she asked Tolliver where Lovett was, and he said, with a smile, that "the bitch was dead." When she pressed him further and asked if he had anything to do with the murder, she testified that he just smiled. At the time of this 1991 interview, Andee Caver, then sixteen years of age, volunteered to the police that when her father was living in California, she visited him, and during one visit he told her he had killed a girl named "Little Bit" and had hired some guys to kill her.

In 1998, the Euclid Police Department used a new, sophisticated fingerprint identification system connected to the Cleveland Police Department database and identified two of the prints from the Lovett crime scene as those of Robbie Robertson, Fortson's brother and one of his 1978 associates. In 1999, while being held by New York City police on a robbery charge, Robertson denied Fortson's involvement in Lovett's murder but alluded to another unnamed person. In an interview with Euclid police, he indicated that the murderer may have been someone who drove him to Lovett's apartment at some time and that any evidence against him was placed at the scene by an unnamed person.

In April 2000, shortly before Fortson and Robertson were tried on charges of aggravated murder and conspiracy to commit aggravated murder, the remaining fingerprint was identified as belonging to Tolliver.[2] Subsequently, Tolliver was charged with one count of aggravated murder, with one count of murder as a lesser included offense, and, one count of conspiracy to commit aggravated murder, with one count of conspiracy to commit murder as a lesser included offense of that charge. A jury found him guilty of conspiracy to commit murder, in violation of R.C. 2923.01 and R.C. 2903.02 and he was immediately sentenced to ten to twenty-five years in prison, following the entry of the verdict.

---

**2.** In a joint trial in May 2000, Fortson was convicted of aggravated murder and acquitted on the conspiracy charge. Robinson was found not guilty of both charges. See *State v. Fortson* (Aug. 2, 2001), Cuyahoga App. No. 78240, unreported, 2001 WL 898428, that incorrectly stated that the conspiracy charges had been dismissed.

His first assignment of error states:

"I. Failure of defense counsel to raise a statute of limitations defense as it applied to the conspiracy charge constitutes ineffective assistance of counsel."

The criminal statute of limitations for any felony other than aggravated murder or murder is six years.[3] Tolliver complains that, since Lovett's murder was discovered on June 2, 1978, the state had the obligation to bring forth charges of any supposed conspiracy against him by June 2, 1984. Because no such prosecution was brought until May 25, 2000, he maintains that the assertion of a statute-of-limitations defense to the conspiracy charges would have been successful and when he was found not guilty of the aggravated murder/murder charges, he would have gone free instead of being subject to a verdict on the conspiracy charges. The state counters that the conspiracy in which Tolliver was a participant continued as an offense through its concealment by Fortson, Robertson, and Tolliver, until he was identified as a suspect. The statute of limitations, it argues, began to run only on that date.

We note at the outset that, while some Ohio appellate case law holds that criminal statutes of limitations may be waived if not asserted at the trial level,[4] this court has repeatedly held that such a defense is jurisdictional and may be raised at any time, and even when a defendant has pleaded guilty to the offense later challenged as time-barred.[5] Criminal statutes of limitations "normally begin to run when the crime is complete,"[6] and do not begin to run until the *corpus delicti* making up the offense is discovered.[7] *Corpus delicti* is the body or substance of a crime and is made up of two elements: (1) the act itself and (2) the criminal agency of the act.[8]

"This doctrine touching *corpus delicti* is of ancient origin and was born out of great caution by the courts, in consideration of certain cases of homicide wherein

---

**3.** R.C. 2901.13(A)(1).

**4.** See *State v. Brown* (1988), 43 Ohio App.3d 39, 539 N.E.2d 1159.

**5.** *State v. Robinson* (Feb. 17, 2000), Cuyahoga App. No. 75423, unreported, 2000 WL 193219; *State v. Hollis* (1993), 91 Ohio App.3d 371, 632 N.E.2d 935; *State v. Mitchell* (1992), 78 Ohio App.3d 613, 605 N.E.2d 978; *Cleveland v. Hirsch* (1971), 26 Ohio App.2d 6, 55 O.O.2d 26, 268 N.E.2d 600.

**6.** *State v. Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A.* (1999), 85 Ohio St.3d 582, 586, 709 N.E.2d 1192, 1195.

**7.** R.C. 2901.13(F); *State v. Climaco, supra,* at 585–586, 709 N.E.2d at 1195.

**8.** *State v. Climaco, supra,* at 586, 709 N.E.2d at 1195; *State v. Maranda* (1916), 94 Ohio St. 364, 114 N.E. 1038, syllabus.

it had turned out that by reason of a failure of the government to prove the death of the person charged as having been murdered it so happened that such person sometimes survived the person accused as his murderer. Therefore, the rule that there must be some evidence tending to prove the fact that death had actually ensued; which was later followed by an additional requirement of some evidence that that death was brought about by some criminal agency."[9]

R.C. 2901.13 expressly states that the period of limitation for an offense begins "after an offense is committed," not after a suspect is identified. Ohio courts have repeatedly held that "the plain wording of the statute requires that felony prosecutions (other than aggravated murder or murder) must be brought within six years from the date the offense is committed."[10]

■ While Ohio courts have apparently not visited the question of when the statute of limitations begins to run for the crime of conspiracy, federal and other state jurisdictions generally hold that the statute of limitations begins to run on a conspiracy charge when the underlying purpose of the conspiracy has been fulfilled.[11] Another phrasing of the rule contemplates the running of the statute of limitations from the time that the last overt act committed in furtherance of the conspiracy occurs[12]:

"[A]cts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy. Consequently, upon successful attainment of the substantive offense which is the primary object of the conspiracy, the period of the statute of limitations for the conspiracy begins to run at the same time as for the substantive offense itself. * * * Our holding leaves unaffected the basic proposition that the limitation period begins to run upon completion of the last overt act in furtherance of the conspiracy * * *; it simply means that for purposes of the statute of limitations an overt act in furtherance of the conspiracy cannot be committed subsequent to the completion of the object which made the conspiracy unlawful in the first instance."[13]

---

**9.** *State v. Maranda, supra,* at 370, 114 N.E. at 1040.

**10.** *State v. Hensley* (1991), 59 Ohio St.3d 136, 137, 571 N.E.2d 711; *State v. Epps* (Dec. 10, 1998), Cuyahoga App. No. 73308, unreported, 1998 WL 855627.

**11.** See Annotation, When Does Statute of Limitation Begin to Run Against Civil Action or Criminal Prosecution For Conspiracy (2001), 62 A.L.R.2d 1369, Sections 2 and 3; Annotation, When is Conspiracy Continuing Offense for Purposes of Statute of Limitations Under 18 U.S.C.A. Sec. 3282 (2001), 109 A.L.R. Fed. 616.

**12.** *Id.;* see, also, *e.g., Missouri v. Shriver* (Mo.App.1987), 741 S.W.2d 836, *California v. Zamora* (1976), 18 Cal.3d 538, 134 Cal.Rptr. 784, 557 P.2d 75.

**13.** *California v. Zamora, supra,* at 560, 134 Cal.Rptr. at 798, 557 P.2d at 89.

■■ For crimes such as fraud or bribery, where the benefits of the underlying crime can be realized after the actual commission of the unlawful act, the statute of limitations can be tolled until the last payment of money.[14] Where the conspiracy itself is understood to be a continuous sequence of repeated crimes (such as in a RICO prosecution), courts have also justified tolling of the limitation period.[15] R.C. 2901.13(D) reads:

"An offense is committed when every element of the offense occurs. In the case of an offense of which an element is a continuing course of conduct, the period of limitation does not begin to run until such course of conduct or the accused's accountability for it terminates, whichever occurs first."

This language seems to partially statutorily adopt the above findings of other jurisdictions and is consistent with our decision. Indeed, according to R.C. 2923.01(E), "A conspiracy terminates when the offense or offenses that are its objects are committed, or when it is abandoned by all conspirators."

There is no support for the state's proposition that the concealment of a conspiracy that has achieved its objective tolls the statute of limitations until all conspirators are identified. *State v. Shelton,*[16] cited by the prosecution, stands for the proposition that a declaration of a co-conspirator made after the completion of a crime may be admissible against any co-conspirator if it was made while the parties were still concerned with the concealment of their criminal conduct or their identity.[17] This proposition of law is consistent with the use of statements of co-conspirators as nonhearsay testimony permitted under Evid.R. 801(D)(2)(e), which states that "a statement by a co-conspirator of a party during the course and furtherance of the conspiracy upon independent proof of the conspiracy" is treated as an admission of a party-opponent. The evidentiary use of a co-conspirator's statement at trial, however, is considered and permitted based on the supposed reliability of the statement. This is a totally different question than when the statute of limitations begins to run in a case of criminal conspiracy, and is not dispositive of the issue. Hence, we do not find the reasoning embodied in *State v. Shelton* applicable *sub judice.*

Rather, *State v. Epps, supra,* directly addresses and trumps the state's contention that identification of a specific suspect triggers the running of a criminal statute of limitations for that party. Such an interpretation would

---

14. See Footnote 18.

15. *Id.*

16. (1977), 51 Ohio St.2d 68, 5 O.O.3d 42, 364 N.E.2d 1152.

17. *Id.* at paragraph two of the syllabus.

effectively defeat a stated purpose of criminal statutes of limitations, which is to ensure prompt investigation and resolution of contemplated prosecution of a given defendant. It is also clear from the text of R.C. 2901.13 and the historical concept of a crime's *corpus delicti*, that the policy behind the tolling of a criminal statute of limitations, pursuant to R.C. 2901.13(F), is to make sure that the limitation period does not run until it becomes apparent that a criminal act has been committed and those who would enforce the law are on notice of the need to investigate the facts of the crime.

Ohio law defines the crime of conspiracy as follows:

"(A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, * * * shall do either of the following:

"(1) With another person or persons, plan or aid in planning the commission of any such offense;

"(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any such offense.

"(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by him or a person with whom he conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of such character as to manifest a purpose on the part of the actor that the object of the conspiracy should be completed. * * * "[18]

 In an indictment for conspiracy, the state must specifically allege "overt acts" upon which the alleged conspiracy is based or it is fatally flawed.[19] Tolliver's indictment for conspiracy to commit aggravated murder contains a description of the following overt acts alleged to have been committed on or about June 2, 1978, in furtherance of the conspiracy: (1) that Tolliver drove Robertson and Fortson to Lovett's apartment, with the purpose to commit aggravated murder; and (2) that he entered Lovett's apartment by deception, with the purpose to commit aggravated murder. In the case *sub judice*, all acts alleged by the state had been completed upon the discovery of Lovett's body on June 2, 1978. While Conners' 1986 interview in Florida and the 1991 statements of Brenda and Andee Caver implicated Fortson and possibly unspecified other parties in the murder, the coroner's 1978 ruling of a homicide, the exceptionally brutal nature of the crime, the obvious struggle that culminated in death—which was suggestive of more than one assailant—and the recovery of the three

---

18. R.C. 2923.01.

19. *State v. Childs* (2000), 88 Ohio St.3d 194, 724 N.E.2d 781.

fingerprints on the drinking glasses, were all that was necessary to reveal the criminality of Lovett's demise and the possibility of a conspiracy behind it. In the absence of some other factor that would toll the running of the statute of limitations for the conspiracy charged (*e.g.*, that Tolliver may have fled this jurisdiction in order to evade prosecution[20]), the state would have been obligated to pursue the charges herein by indictment before June 2, 1984.

■ We are mindful that to find that Tolliver's counsel was prejudicially ineffective in failing to move for dismissal of the conspiracy counts of the indictment, we must conclude that, but for his error, it is reasonably probable that the result of the trial would have been different.[21] We do so find, for two reasons. First, the jury acquitted Tolliver of the charges of murder and aggravated murder. Murder is the purposeful killing of another,[22] and, for purposes of the case *sub judice*, aggravated murder is the purposeful killing of another with prior calculation and design.[23] No evidence was presented at trial to indicate that Tolliver had a hand in the death of Lovett, other than a fingerprint on a glass in her apartment, and his failure to deny involvement in the murder when questioned by Conners in 1978. There can be little dispute that this evidence is insufficient to enable a jury to find, beyond a reasonable doubt, that Tolliver was guilty of either murder or aggravated murder. Second, in the absence of prosecution for murder or aggravated murder, which have no statutes of limitations,[24] a successful challenge to the charges of conspiracy on statute-of-limitations grounds would have resulted in complete acquittal instead of incarceration for ten to twenty-five years.

Ineffective-assistance claims are governed by a two-prong test first articulated in *Strickland v. Washington.*[25] First, the appellant must show that counsel's performance "fell below an objective standard of reasonableness," and "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[26] Second, the appellant must demonstrate prejudice—*i.e.*, "a reasonable probability that, were it not for counsel's errors, the

20. See R.C. 2901.13(G).

21. *Strickland, supra.*

22. R.C. 2903.02(A).

23. R.C. 2903.01(A).

24. R.C. 2901.13(A)(1).

25. (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

26. *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

result of the trial would have been different."[27] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[28, 29]

Since we find clear error in the failure of Tolliver's lawyer to seek dismissal of the conspiracy charges contained in his indictment, the first assignment of error has merit.

"II. The lower court erred when it denied defendant's motion for acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure."

"IV. There was insufficient evidence presented by the state of Ohio to support a conviction for conspiracy to commit murder."

Since Tolliver, after moving for acquittal pursuant to Crim.R. 29 at the conclusion of the state's case, elected not to present a defense and rested, his second and fourth assignments of error raise, in essence, one issue: whether sufficient evidence was presented to enable the jury to reach a guilty verdict on his conspiracy charges.

 Whether the evidence is legally sufficient to sustain a verdict is a question of law.[30] According to Crim.R. 29:

"The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. * * * *"

 Whether phrased in terms of a Crim.R. 29 motion, or in terms of a sufficiency of the evidence argument, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[31] There is no distinction in the particular weight or way of evaluating the evidence, be it direct or circumstantial.[32] "Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence."[33]

27. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

28. *Strickland, supra,* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

29. *State v. Sanders* (2002), 94 Ohio St.3d 150, 761 N.E.2d 18.

30. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148.

31. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

32. *Id.* at 272, 574 N.E.2d at 502.

33. *Id.*

The evidence established that Tolliver, at the time of Lovett's death, was an associate and relative of Fortson, and he was known to carry a gun or knife and would attack people at Fortson's request. His fingerprint was evidence that he had touched a glass found in Lovett's orderly, completely clean kitchen, lending clear support to the inference he was present very shortly before, if not during, her murder. Brenda Caver testified that, in 1978 when she asked Tolliver if he had anything to do with Lovett's death, he did not deny involvement, but, rather, smiled. The jury could have treated this conduct as an adoptive admission.

" ' * * *An adoptive admission, or an admission by acquiescence, consists of a statement by a non-party which may be deemed to be that of a party by virtue of the failure of the party to deny the statement. * * * In applying the rule, courts have been careful to consider the circumstances under which the utterance is made to insure that the party understood the utterance, that he was free to make a response, and that a reasonable person would have denied the statement. * * * ' "[34]

Would a reasonable person who was not involved in Lovett's murder deny having anything to do with it? Tolliver understood Caver's question and did respond to it, although not in words. The jury could have interpreted Tolliver's smile as an implicit admission of involvement or guilty knowledge, and could have convicted him on that basis, identifying entry by deception as the overt act taken in pursuit of the conspiracy.[35] The second and fourth errors are not well taken.

The third assignment of error states:

"III. The jury determination in [the] lower court was against the manifest weight of the evidence."

In evaluating a challenge to the verdict based on the manifest weight of the evidence presented at trial, a court sits as the thirteenth juror and intrudes its judgment into proceedings which it finds to be fatally flawed through

---

34. *State v. Vitanza* (Mar. 27, 1992), Lake App. No. 91–L–053, unreported, 1992 WL 190586; see, also, *State v. Kidder* (1987), 32 Ohio St.3d 279, 284, 513 N.E.2d 311; and *State v. Porter* (Mar. 11, 1982), Cuyahoga App. No. 43825, unreported, 1982 WL 5225. Such statements are not hearsay and are admissible at trial pursuant to Evid.R. 801(D)(2)(b).

35. Brenda Caver testified that Fortson always drove his own cars and that others, like Tolliver or Robertson, would ride with him. The state's theory at trial was that Fortson and Tolliver had gained entrance to Lovett's apartment either by misrepresenting their motive for being there (assuming she answered the door), or by using Fortson's key to sneak in. As such, entry by deception is the only overt act that could reasonably be considered as committed in furtherance of the conspiracy.

misinterpretation or misapplication of the evidence by a jury which has "lost its way."[36] This power is subject to strict and narrow constraints:

"* * * Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*' (Emphasis added.) * * *

"* * * ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."[37]

█ Based on our above disposition of the second and fourth assignments of error, and mindful of the extremely limited scope of any manifest-weight inquiry, we conclude that the jury "kept its way" and found appropriately according to the evidence presented. Tolliver's third assignment of error is not well taken.

█ We remand this case for proceedings consistent with this opinion. The judge is to permit the state to present evidence of the possible tolling of the statute of limitations on the conspiracy charge against Tolliver, to which he may respond. If it is determined that Tolliver's conviction should be upheld, judgment of conviction may be re-entered and sentence in compliance with R.C. 2929.11 through 2929.19 imposed.

Judgment reversed, sentence vacated, and case remanded with instructions.

*Judgment reversed and cause remanded.*

ANN DYKE and COLLEEN CONWAY COONEY, JJ., concur.

---

36. See *State v. Thompkins, supra.*

37. *State v. Thompkins, supra,* at 387, 678 N.E.2d 541. (Internal cites omitted.)