[Cite as *State v. Byrd*, 2012-Ohio-1138.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

State of Ohio,                                             :
                                                          :
    Plaintiff-Appellee.                                    :
                                                          :        Case No. 10CA3390
    v.                                                     :
                                                          :        DECISION AND
Robert W. Byrd,                                           :        JUDGMENT ENTRY
                                                          :
    Defendant-Appellant.                                   :        Filed:  March 12, 2012
_____

APPEARANCES:

Robert A. Cassity, Portsmouth, Ohio, for Appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, and Pat Apel, Scioto County
Assistant Prosecuting Attorney, Portsmouth, Ohio, for Appellee.
_____

Kline, J.:

{¶1}    Robert Byrd (hereinafter "Byrd") appeals the judgment of the Scioto County

Court of Common Pleas, which convicted him of seven felonies related to sexual activity

between Byrd and his teenage daughter (hereinafter "Victim").  Byrd contends that the

trial court erred when it denied his motion for a continuance to gather Victim's medical

records.  Because Victim's medical records were not necessary for Byrd to prepare for

trial or for a pre-trial in camera hearing, we disagree.  Next, Byrd contends that the trial

court erred when it denied his motion for appropriation of funds to secure an expert

witness.  Because the denial of funds to secure an expert witness did not deprive Byrd

of a fair trial, we disagree.  Next, Byrd claims that he suffered ineffective assistance of

counsel because his trial counsel did not have the requested medical records.  Because

Byrd can show neither that his trial counsel's performance was deficient nor that he was prejudiced by the alleged deficient performance, we disagree. Next, Byrd contends that the trial court erred when it prevented a material witness (i.e., Byrd's wife/Victim's stepmother) from testifying. We agree that the trial court erred, but we find any error harmless beyond reasonable doubt. Finally, Byrd contends that the trial court erred when it failed to merge his convictions for gross sexual imposition and rape. Because Byrd committed these offenses with a separate animus, we disagree.

I.

{¶2}     In August 2009, Victim returned to Wheelersburg, Ohio, after visiting her mother, Paula Conner, in North Carolina. Around the same time, Byrd and his wife, Dana Byrd (hereinafter "Dana"), separated, and Byrd moved into an apartment. On one occasion in or around August 2009, Byrd lay with Victim at the apartment. Byrd rubbed Victim's back, and then he rubbed her breast. Byrd then rubbed Victim's vagina. Later, on another occasion in or around August 2009, Byrd lay with Victim, and he removed Victim's clothing. Byrd rubbed Victim's breast and vagina just as he had done on the first occasion. Byrd also performed oral sex on Victim on this occasion. And when Victim tried to scoot away, Byrd put his hands on her to hold her in place. Shortly after these incidents, Victim moved to North Carolina to live with Conner.

{¶3}     In December 2009, Victim returned to Wheelersburg, Ohio, for the Holidays. Victim stayed with Byrd at his apartment. On one occasion during her December stay, Victim was laying in bed with her younger brother and sister. After her brother and sister fell asleep, Byrd got into bed with the three children and removed Victim's

clothing.  Byrd then rubbed Victim's breasts, ran his hands through Victim's vagina, and performed oral sex on Victim.

{¶4}     On another occasion during the Holidays, near New Year's Eve, Byrd again lay with Victim at his apartment.  Byrd removed Victim's clothing, and he rubbed her breast and her vagina.  And Byrd again performed oral sex on Victim.  Byrd also took Victim's hand and made her masturbate him until he ejaculated on her.  Byrd then ordered Victim to get a towel, and Byrd cleaned up.

{¶5}     After the Holidays, Victim returned to North Carolina.  Over the next several weeks, Victim began asking Conner questions that gave Conner cause for concern.  For example, Victim asked Conner whether a woman could get pregnant if a man ejaculated on her jeans.  Victim also asked Conner whether sex between family members would produce a mentally handicapped child.

{¶6}     During February 2010, Victim informed Conner what had happened between Byrd and Victim.  Conner then began listening in on conversations between Byrd and Victim.  Conner could hear both Victim and Byrd during the conversations because Victim used the speakerphone function on her cell phone.  Conner testified about a conversation she overheard between Byrd and Victim.  During that conversation, Conner testified that Victim said to Byrd: "Dad, do you remember * * * that night you took my hand and put it on you [and] * * * came all over me."  Trial Tr. at 147.  Byrd responded, "Yeah."  Id.  And Victim asked, "Can I get pregnant from that, are you sure I can't get pregnant from that because I think I'm pregnant Dad."  Id. at 147-148.  Byrd responded, "Oh * * *, no I told you – you couldn't."  Id.

**{¶7}** At some point during February, Conner contacted the Scioto County Sherriff's Department regarding Victim's allegations. And Conner eventually downloaded computer software, which allowed Victim to record her conversations with Byrd. A recorded conversation was played for the jury. During the recorded conversation, Byrd and Victim had the following exchange:

**{¶8}** "[Byrd]: * * * So, anyway, she [i.e., Conner] asked you and you told her what?

**{¶9}** "[Victim]: And I – I told her, like – I kept asking the same question. She's like, what is going on and I said, well, I touched * * * somebody and it got – on my hand and she said what got on your hand. I said well they ejaculated and she's like well who was it and I said a person and I wouldn't tell her and then she, well she said is it anybody from down here and I said no and she said up north and I said yes and she thought it was the same boy again and she said was like was it that boy and I said no. And then I finally told her and she was like well I don't believe that and so she thinks I'm covering up somebody else now.

**{¶10}** "[Byrd]: So, what are you going to tell her?

**{¶11}** "* * *

**{¶12}** "[Victim]: I don't know. She keeps asking me though.

**{¶13}** "[Byrd]: I know – well, I mean –

**{¶14}** "[Victim]: And I don't want to lie to her cause it was you. Plus she don't believe me * * *. Like, what should I do?

**{¶15}** "[Byrd]: -- well, I guess that all depends on what you want the outcome to be * * *. Honestly, I mean, If you want me –

**{¶16}** "* * *

**{¶17}**     "[Byrd]: -- well, what I was saying, it all depends on what you want the outcome to be.

**{¶18}**     "[Victim]: I don't know.

**{¶19}**     "[Byrd]: Well, --

**{¶20}**     "[Victim]: I don't want you to go to jail, but – but like – cause I thought I was wrong for letting it happen.  Like, I thought it was my fault, that's why I didn't tell anybody, like my Mom when she asked.

**{¶21}**     "[Byrd]: -- I already told you it wasn't your fault.

**{¶22}**     "[Victim]: Can I ask you a question and you won't get mad at me?

**{¶23}**     "[Byrd]: What, Baby?

**{¶24}**     "[Victim]: Why did it happen?

**{¶25}**     "[Byrd]: Well, you remember that night on the couch and I told you that I was going to go to bed – that this was going to go too far and you kept pulling me back?

**{¶26}**     "[Victim]: No.

**{¶27}**     "[Byrd]: Well, that's why it happened on Kenna Drive.

**{¶28}**     "[Victim]: I don't remember that."  Trial Tr. at 156-158.

**{¶29}**     Later during the same conversation, Byrd implied to Victim that he would commit suicide if Victim told Conner what had happened between Victim and Byrd.  Byrd left Ohio soon after the recorded conversation.  Byrd's family located Byrd in a hotel in Kentucky, and he had apparently attempted to commit suicide.  Byrd eventually turned himself into police.

**{¶30}**     A jury convicted Byrd of two counts of sexual battery, three counts of gross sexual imposition, and two counts of rape.  The trial court sentenced Byrd to five years

in prison for each of the sexual battery counts, eighteen months for each count of gross sexual imposition, and ten years for each count of rape. The trial court ordered one count of sexual battery and one count of rape to be served consecutively to each other and concurrently with the remaining counts. Thus, Byrd's aggregate prison sentence is for fifteen years.

{¶31}   Byrd appeals and asserts the following assignments of error: I. "The Trial Court Erred in Overruling Appellant's Motion to Continue." II. "The Trial court Erred in Overruling Appellant's Motion for Appropriation of Funds to Secure an Expert Witness." III. "The Appellant is entitled to a new trial due to Ineffective Assistance of Counsel." IV. "The Appellant is entitled to a new trial due to the Trial Court's preventing a material witness from testifying." And, V. "The Trial Court erred when it convicted Appellant of both Rape and Gross Sexual Imposition."

II.

{¶32}   For ease of analysis we consider Byrd's assignments of error out of order, and we begin with Byrd's second assignment of error. In his second assignment of error, Byrd contends that the trial court erred when it denied his motion for the appropriation of funds to secure an expert witness.

{¶33}   We review a trial court's decision regarding appropriation of funds to secure an expert witness under an abuse of discretion standard. *State v. Mason*, 82 Ohio St.3d 144, 1998-Ohio-370, at syllabus; *State v. Tyree*, Cuyahoga App. No. 93800, 2010-Ohio-4250, at ¶11. An abuse of discretion "connotes more than a mere error of judgment; it implies that the court's attitude is arbitrary, unreasonable, or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

**{¶34}** "As a matter of due process, indigent defendants are entitled to receive the 'raw materials' and the 'basic tools of an adequate defense,' which may include provision of expert * * * assistance." *Mason* at 149, quoting *Ake v. Oklahoma* (1985), 470 U.S. 68, 77 (other citations omitted). "Due process * * * requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *Mason* at syllabus.

**{¶35}** Byrd claims that he needed an expert to review Victim's medical records. According to Byrd, an "expert would have provided the defense with an opinion directly relating to whether or not the alleged sexual offense occurred based off of the medical and psychiatric records, and history and development of the alleged victim." Appellant's Brief at p. 16. Essentially, Byrd wanted an expert to review Victim's medical records to determine whether Victim's behavior was consistent with the behavior of a child who had been sexually abused. Byrd relies on *State v. Stowers*, 81 Ohio St.3d 260, 1998-Ohio-632, and *State v. Boston* (1989), 46 Ohio St.3d 108, to argue that "the expert opinion regarding the ultimate issue of whether sexual abuse in the case at bar occurred will be helpful to the jurors, especially in light of the several diagnoses of the alleged victim in this case." Appellant's Brief at p. 16.

**{¶36}** "[E]xpert testimony on the ultimate issue of whether sexual abuse has occurred in a particular case is helpful to jurors and is therefore admissible pursuant to Evid.R. 702 and 704." *State v. Gersin*, 76 Ohio St.3d 491, 494, 1996-Ohio-114, citing

*Boston.* Such expert testimony, however, does not prove or disprove an essential element in the case. Instead, the expert testimony assists the trier of fact in making a credibility determination.

**{¶37}** As the Supreme Court of Ohio explained: "*Boston*'s syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (*e.g.,* the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person). It does not proscribe testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." *Stowers* at 262-263 (emphasis sic). Therefore, the expert testimony is "evidence which *bolsters a child's credibility*[.]" Id. at 262 (emphasis added).

**{¶38}** Thus, the expert testimony Byrd hoped to introduce would not prove or disprove an essential element of any of the charges against Byrd. Instead, the opinion would merely help or hinder Victim's credibility. (Presumably, Byrd would have introduced the expert testimony in an effort to *hinder* Victim's credibility.) And even assuming that Byrd demonstrated a reasonable probability that such an expert opinion would aid his defense, he cannot show that the denial of funds to secure expert testimony deprived him of a fair trial. "[E]ven in cases where an indigent defendant establishes the value of expert assistance to his defense, a court still does not abuse its discretion by refusing to provide the accused with state-funded expert assistance when there are other adequate means available which obviate the need for such assistance." *State v. Bandy*, Lake App. No. 2007-L-089, 2008-Ohio-1494, at ¶42, quoting *State v. Booker* (Nov. 24, 1999) Montgomery App. No. 17709. Other adequate means to

obviate the need for expert assistance include cross-examination of witnesses and the opportunity to comment on witness testimony during closing argument. See id. See, also, *State v. Williams*, Nos. 2005-L-213 & 2005-L-214, 2007-Ohio-212, at ¶44 ("Although a medical expert would be capable of accurately evaluating the victim's medical records and the impact of the victim's medications, we do not see how this information would assist him in disproving any of the elements of the crimes he was accused of committing.").

**{¶39}** Credibility determinations "are primarily for the trier of the facts." *State v. Jackson* (1993), 86 Ohio App.3d 29, 32-33. And Victim's credibility was on full display before the jury. Indeed, Victim admitted that she had been in trouble before "because of * * * lying." Trial Tr. at 81. Byrd's trial counsel also presented Victim with a text message she had sent to Byrd during the time frame of the alleged crimes. The text message stated that Victim was "sick of crying [herself] to sleep or crying until [Victim doesn't] have any tears left" due to fights between Victim and her mother. Trial Tr. at 101. Victim admitted that the substance of her text message was a lie. Thus, Byrd was able to present evidence to the jury that highlighted Victim's credibility issues, and, therefore, the trial court's denial of Byrd's motion for the appropriation of funds to secure an expert witness did not deprive Byrd of a fair trial. See *State v. Simmons*, Summit App. No. 24218, 2009-Ohio-1495, at ¶8 ("[A]s the jury is entitled to believe or disbelieve a witness, [the defendant] could not show that the denial of an expert to testify with regard to [the victim's] credibility would have resulted in an unfair trial."), vacated on other grounds by *State v. Simmons*, 123 Ohio St.3d 1491, 2009-Ohio-6015.

{¶40}    Therefore, the trial court did not abuse its discretion when it denied Byrd's motion for the appropriation of funds to secure expert testimony.  Accordingly, we overrule Byrd's second assignment of error.

III.

{¶41}    Next, we consider Byrd's first assignment of error.  In his first assignment of error, Byrd contends that the trial court erred when it denied his motion to continue.  Byrd claims that he needed more time to investigate Victim's medical records to prepare his defense.

{¶42}    "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge.  An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion."  *State v. Unger* (1981), 67 Ohio St.2d 65, 67.

{¶43}    "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  Id., quoting *Ungar v. Sarafite* (1964), 376 U.S. 575, 589.  "Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice."  *Unger* at 67.

{¶44}    When ruling on a motion to continue, a court should consider: "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or

contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." Id. at 67-68.

{¶45} On July 1, 2010, Byrd initially requested a four-month continuance from the July 19, 2010 trial date. The trial court did not grant a four-month continuance, but it did continue the case until August 23, 2010. After learning of the August 23 trial date, Byrd moved to continue the trial until October 1, 2010. The trial court denied Byrd's second request for a continuance, and Byrd's trial began on August 23, 2010.

{¶46} The records Byrd sought related to Victim's psychological counseling. Byrd hoped to use Victim's medical records (1) so that an expert could offer an opinion that would shed light on Victim's credibility (as detailed above in Byrd's second assignment of error); and (2) to help show, during an in camera hearing, that a prior rape allegation by Victim was false.

A. Continuance Was Not Necessary to Prepare for Trial

{¶47} Byrd argues that he needed a continuance to gather Victim's medical records, which he claims were necessary to prepare for trial. As we noted above, Byrd sought an expert opinion based on Victim's medical records, which would be a credibility assessment. And as we held in assignment of error two, the denial of funds to secure an expert witness did not deprive Byrd of a fair trial. Thus, Byrd's requested continuance to obtain Victim's medical records was not necessary for Byrd to prepare for trial. Therefore, Byrd cannot show that the trial court abused its discretion by denying his motion for a continuance on this basis.

B. Continuance Was Not Necessary to Prepare for the In Camera Hearing

**{¶48}** Byrd also argues that he needed more time to gather medical records to prepare for an in camera hearing prior to trial. On August 20, 2010, the trial court held an in camera hearing regarding a prior rape accusation Victim had made against another family member. Byrd claims that Victim's prior accusation was a false rape accusation, which Byrd would have attempted to bring to the jury's attention. Byrd sought to use Victim's medical records to demonstrate that her prior accusation was false.

**{¶49}** The in camera hearing was necessary to determine if Ohio's Rape Shield Law, R.C. 2907.02(D), applied to Byrd's case. R.C. 2907.02(D) provides: "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

**{¶50}** "False [rape] accusations, where no sexual activity is involved, do not fall within the rape shield statute. Therefore, a defendant is permitted under Evid.R. 608(B), in the court's discretion, to cross-examine the victim regarding such accusations if 'clearly probative of truthfulness or untruthfulness.' However, the defendant will be bound by the answers given by the victim." *State v. Boggs* (1992), 63 Ohio St.3d 418, 421.

**{¶51}** "Where an alleged rape victim admits on cross examination that she has made a prior false rape accusation, the trial judge shall conduct an *in camera* hearing to

ascertain whether sexual activity was involved and, as a result, cross-examination on the accusation would be prohibited by R.C. 2907.02(D), or whether the accusation was totally unfounded and therefore could be inquired into pursuant to Evid.R. 608(B)."  Id. at paragraph two of the syllabus.

{¶52}    Here, the trial court held the in camera hearing prior to trial.  Under *Boggs*, a defendant may inquire into the prior accusation at trial only when the prior accusation was "totally unfounded."  Id.  "[T]he defendant has the burden to 'demonstrate that the accusations were totally false and unfounded.'"  *State v. Netherland* (1999), 132 Ohio App.3d 252, 262, quoting *Boggs* at 423.  "[T]he trial court must be satisfied that the prior allegations of sexual misconduct were actually false or fabricated." *Netherland* at 262.

{¶53}    When Victim was seven years old, she accused a relative of sexually abusing her.  After informing her family of the allegations, Victim was taken to the police station. At the police station, however, Victim recanted her accusation.  During the in camera hearing, Victim testified as follows:

{¶54}    "[Victim]: And my Dad [i.e., Byrd] had told me that – that if it was untrue, that he was going to send me off somewhere and he didn't even care.  And you know, that scared me, and all those police officers were around me and like – I just – it didn't happen, it didn't happen.  I mean –

{¶55}    "[Court]: So you changed your story when you got to the police station?

{¶56}    "[Victim]: Yeah, just like that, yeah.

{¶57}    "[Court]: So you're saying it really did happen.

{¶58}    "[Victim]: Yeah, it did happen but I said it didn't at the police station."  Aug. 20, 2010 Hearing Tr. at 12-13.

**{¶59}** The trial court determined that the prior accusation was not "totally unfounded." As Victim testified, the prior allegation involved a specific instance of Victim's sexual activity. Consequently, the Rape Shield Law prohibited Byrd from exploring the issue on cross-examination at trial.

**{¶60}** Byrd claims that he needed Victim's medical records to demonstrate, during the in camera hearing, that the prior rape allegation was false. Essentially, Byrd asserts that Victim had been diagnosed with various psychological conditions and that symptoms of those conditions demonstrate a propensity to be untruthful.

**{¶61}** A prior rape allegation, even a false allegation, is an entirely collateral matter. See *Boggs* at 422; see, also, *State v. Ferrell*, Cuyahoga App. No. 90277, 2008-Ohio-4241, at ¶22. The trial court was not obligated to allow Byrd to delve into Victim's medical history, which may have helped Byrd show (during a hearing on a collateral matter) that Victim was predisposed to lying about the prior rape allegation. Thus, the trial court did not abuse its discretion by refusing to grant Byrd a continuance to obtain Victim's medical records to prepare for the in camera hearing.

**{¶62}** (We also note that, on appeal, Byrd states that Victim has made "a number of prior rape allegations." Appellant's Brief at 14. The only prior allegation apparent from the record, however, is the allegation that was the subject of the in camera hearing.)

C. Denial of Motion to Continue Was Not an Abuse of Discretion

**{¶63}** As detailed above, the trial court did not err in denying Byrd's motion for the appropriation of funds to secure an expert witness because the expert's opinion would address only Victim's credibility. Consequently, Byrd did not need Victim's medical records to prepare for trial. Additionally, Byrd was not necessarily entitled to explore

Victim's medical history to help him prove, during the in camera hearing, that she had made a prior false rape accusation. Therefore, Byrd did not need Victim's medical records to prepare for the in camera hearing.

**{¶64}** The trial court granted Byrd a one month continuance, and, considering the "facts of [this] case[,]" an additional continuance was not necessary. *Unger* at 67-68. Victim's medical records were not necessary for Byrd to prepare (1) for trial or (2) for the in camera hearing. Thus, the trial court did not abuse its discretion when it denied Byrd's motion for a continuance. Accordingly, we overrule Byrd's first assignment of error.

IV.

**{¶65}** In his third assignment of error, Byrd argues that he is entitled to a new trial because his trial counsel was ineffective. Byrd contends that the lack of medical records left his trial counsel unprepared for the in camera hearing and for trial, and therefore, counsel was ineffective.

**{¶66}** A criminal defendant has a constitutional right to counsel, which includes the right to the effective assistance from counsel. *McMann v. Richardson* (1970), 397 U.S. 759, 771; *State v. Lytle* (Mar. 10, 1997), Ross App. No. 96CA2182. "In Ohio, a properly licensed attorney is presumed competent and the appellant bears the burden to establish counsel's ineffectiveness." *State v. Norman*, Ross App. Nos. 08CA3059 & 08CA3066, 2009-Ohio-5458, at ¶65 (internal quotations omitted); see, also, *State v. Wright*, Washington App. No. 00CA39, 2001-Ohio-2473; *State v. Hamblin* (1988), 37 Ohio St.3d 153, 155-56. To secure reversal for the ineffective assistance of counsel, one must show two things: (1) "that counsel's performance was deficient * * *[,]" which

"requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[;]" and (2) "that the deficient performance prejudiced the defense * * *[,]" which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington* (1984), 466 U.S. 668, 687. See, also, *Norman* at ¶65. "Failure to satisfy either prong is fatal as the accused's burden requires proof of both elements." *State v. Hall*, Adams App. No. 07CA837, 2007-Ohio-6091, at ¶11 (citation omitted). "Deficient performance means performance falling below an objective standard of reasonable representation." *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, at ¶44. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, at paragraph three of the syllabus; see, also, *State v. White*, 82 Ohio St.3d 16, 23, 1998-Ohio-363.

**{¶67}**     On appeal, Byrd claims that his trial counsel was ineffective based on trial counsel's statements that he was unprepared. Trial counsel stated that, without Victim's medical records, he would not be prepared for the in camera hearing or for trial. Byrd distorts his trial counsel's assertions that trial counsel was "not prepared." The record is clear that Byrd's trial counsel made these statements in an attempt to persuade the trial court that he needed a continuance to obtain the medical records.

**{¶68}**     Additionally, Byrd's trial counsel also requested to withdraw from the case after the trial court denied his motions for a continuance and for the appropriation of funds to secure an expert witness. Similar to the assertions that he was unprepared,

trial counsel's request to withdraw from the case was also an effort to express his view of the importance of obtaining Victim's medical records.

**{¶69}** Byrd also claims that his trial counsel did not ask Victim any questions during the in camera hearing. This claim is not entirely accurate. Trial counsel did not engage in a traditional cross-examination of Victim during the in camera hearing. The trial court, however, questioned Victim at length regarding the prior rape accusation. And while the trial court questioned Victim, Byrd's trial counsel frequently raised questions and areas of inquiry, which the trial court then asked Victim about.

**{¶70}** The record demonstrates that Byrd's trial counsel mounted a vigorous defense. There is no evidence that trial counsel was dilatory in his preparation for trial. As stated above, the trial court did not err when it (1) denied Byrd's motion for a continuance to obtain Victim's medical records or (2) denied Byrd's motion for the appropriation of expert funds. And the denial of the motions did not render trial counsel's performance deficient. Because Byrd is not able to demonstrate that his trial counsel's performance was deficient, Byrd's ineffective assistance of counsel claim fails.

**{¶71}** Byrd also fails to demonstrate how his trial counsel's alleged deficient performance prejudiced his trial. In fact, Byrd provides no argument in his appellant's brief to demonstrate prejudice. Thus, even assuming that trial counsel's performance was deficient, the ineffective assistance claim still fails. On appeal, Byrd has not shown that, were it not for trial counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different.

{¶72}    In short, Byrd fails to satisfy either prong of his ineffective-assistance claim. Accordingly, we overrule Byrd's third assignment of error.

V.

{¶73}    In his fourth assignment of error, Byrd contends that he is entitled to a new trial because the trial court prevented Byrd's wife, Dana, from testifying. Although Byrd and Dana were separated, they were still married at the time of trial.

{¶74}    Byrd's argument relates to the trial court's interaction with Dana regarding whether she would testify at all. The trial court has discretion "to control the flow of the trial" under Evid.R. 611. *State v. Prokos* (1993), 91 Ohio App.3d 39, 44. "This control includes asking questions of the participants and the witnesses in a search for truth. Evid.R. 614. Since a trial court's powers pursuant to Evid.R. 611 and 614 are within its discretion, a court reviewing a trial court's interrogation of witnesses and comments must determine whether the trial court abused that discretion." Id., citing *State v. Davis* (1992), 79 Ohio App.3d 450, 454.

{¶75}    Byrd called Dana to testify on his behalf, and the state quickly requested a bench conference. At the initial bench conference, the state argued that Dana had to waive the spousal communication privilege. Dana then waived the privilege, and the state called for another bench conference. Following this bench conference, the trial court again asked Dana if she was waiving the privilege. The trial court stated "I want to make a clear record that this is something [Dana is] doing voluntarily." Trial Tr. at 253. The following exchange then ensued:

{¶76}    "[Court]: Do you want to testify?

{¶77}    "[Dana]: I – that's fine.

**{¶78}** "[Court]: And you know and understand you are waiving your privilege?

**{¶79}** "[Dana]: I didn't realize there was any issue.

**{¶80}** "[Court]: I know. I don't want you to make a mistake, either, you know, I want to make sure we do this right. You have to – you have to tell you're waiving your privilege and you wish to testify. If you're unsure the safest route is not to." Id. at 253-254.

**{¶81}** Following this exchange, the trial court conducted yet another bench conference. During this bench conference, the state expressed concern regarding Dana's competency to testify under Evid.R. 601(B). After this bench conference, the trial court stated to Dana: "So Ma'am, I'm going to ask you one more time on the record, do you elect to testify." Id. at 254. Dana responded, "I don't [feel] I can add anything else to this case." Id. The trial court then excused Dana as a witness.

**{¶82}** After several other witnesses testified, the trial court allowed Byrd to recall Dana to the stand. And the following exchange ensued:

**{¶83}** "[Court]: Ma'am, I placed you under oath a little bit earlier. I just remind you you're still under oath. The attorneys have agreed to let you testify and I understand you made a comment in the hall that I told you not to testify, that is not what I meant. Okay? If you wish to testify you just waive the privilege. Is that what you want to do? I didn't tell you not to testify. I think I scared you to death is what I did. I didn't mean to do that.

**{¶84}** "[Dana]: You did.

**{¶85}** "[Court]: I didn't mean to. I'm sorry. So you choose to testify?

**{¶86}** "[Dana]: I choose not to testify." Id. at 278.

**{¶87}** Dana then stated, on the record, that she was initially willing to testify. And she was choosing not to testify because she claimed that she was "afraid to say anything." Id. at 281. Dana confirmed that her fear was a result of her earlier exchange with the trial court.

**{¶88}** The state argues that the trial court initially established that Dana waived her spousal communication privilege. (Essentially, the trial court required a testifying spouse to preemptively waive the spousal communication privilege. The issue of whether requiring such a preemptive waiver is proper is not before us on appeal.) According to the state, the trial court then had to establish, on the record, whether Dana was competent to testify under Evid.R. 601(B). The state relies on *State v. Adamson*, 72 Ohio St.3d 431, 1995-Ohio-199, which held that "under Evid.R. 601(B), the judge must take an active role in determining competency, and make an affirmative determination on the record that the spouse has elected to testify. Just because a spouse responds to a subpoena and appears on the witness stand does not mean that she has elected to testify." Id. at 434.

**{¶89}** The state's argument, however, ignores the plain language of Evid.R. 601(B), which provides: "Every person is competent to be a witness except: * * * (B) A spouse testifying against the other spouse charged with a crime except when either of the following applies: (1) *a crime against* the testifying spouse or *a child of either spouse is charged*; (2) the testifying spouse elects to testify." (Emphasis added).

**{¶90}** Here, a crime against Byrd's child (i.e., Byrd's daughter) was charged. Therefore, Dana was competent to testify under Evid.R. 601(B)(1), and Dana did not need to "elect[] to testify" under Evid.R. 601(B)(2). See *Portsmouth v. Wrage*, Scioto

App. No. 08CA3237, 2009-Ohio-3390, at ¶25; *State v. Smith*, Seneca App. No. 13-03-25, 2003-Ohio-5461, at ¶17.  In fact, Dana could have been compelled to testify.  See *State v. Ellis* (1992), 83 Ohio App.3d 362, 364-65 (noting that, under Evid.R. 601(B)(1), a "spouse can be compelled to testify against the criminally charged spouse"); see, also, *Wrage* at ¶22.

**{¶91}**     (We also note that, during the bench conferences, the state expressed concern that Byrd was inviting error by calling Dana as a witness.  The state argued to the trial court that if the trial court failed to establish that Dana was electing to testify, then Byrd would have grounds for reversal.  The state's concerns were misplaced because "the issue of competency [under Evid.R. 601(B)(2)] is waived when the defendant in a criminal case produces the spouse as a defense witness." *State v. Smith*, Fayette App. No. CA20060-08-030, 2009-Ohio-197, at ¶30, quoting *State v. Smith*, Wayne App. No. 02CA0045, 2003-Ohio-2850, at ¶10.  In *Adamson*, the case the state relies upon, the prosecution called the spouse to testify against the defendant-spouse.  *Adamson* at 431.  Here, by contrast, Byrd called Dana to testify on his behalf.  Consequently, Byrd was not inviting error by calling Dana as a witness.)

**{¶92}**     Thus, the trial court's lengthy exchanges with Dana were unnecessary.  And because the record demonstrates that Dana chose not to testify as a result of the exchanges, the trial court's interrogation of Dana constituted an abuse of discretion.

**{¶93}**     "A trial court's error in failing to comply with Evid.R. 601(B) neither necessarily permeates the entire trial nor prevents the trial from reliably serving its function as a vehicle for determining guilt or innocence. * * * A violation of Evid.R. 601(B) therefore is not structural error requiring automatic reversal." *State v. Davis*, 127 Ohio St.3d 268,

2010-Ohio-5706, at ¶23.  However, Byrd has a constitutional right to present witnesses in his favor.  See *Washington v. Texas* (1967), 388 U.S. 14, 19; *City of Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 4-5; see, also, U.S. Const. Amend. VI; Section 10, Article I of the Ohio Constitution.  The trial court erroneously prevented a witness from testifying on Byrd's behalf.  Therefore, the error was a constitutional error.

**{¶94}**     Nevertheless, not all constitutional errors are prejudicial.  "A constitutional error can be held harmless if * * * it was harmless beyond a reasonable doubt."  *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, at ¶78, citing *Chapman v. California* (1967), 386 U.S. 18, 24.  Error is harmless beyond a reasonable doubt if there is no "reasonable possibility that the evidence complained of might have contributed to the conviction."  *Conway* at ¶78.  See, also, *State v. Arnold*, Franklin App. No. 07AP-789, 2010-Ohio-5622, at ¶6 ("[E]rror in the * * * exclusion of evidence in a criminal trial must be considered prejudicial unless the court can declare, beyond a reasonable doubt, that the error was harmless, and unless there is no reasonable possibility that * * * the exclusion of evidence[] may have contributed to the accused's conviction.") (citation omitted); *State v. Thompson*, Franklin App. No. 07AP-491, 2008-Ohio-2017, at ¶14 ("Error in excluding evidence is harmless if the jury would not have rendered a different verdict had the excluded evidence been admitted at trial.") (citation omitted).

**{¶95}**     At trial, Byrd's trial counsel noted, on the record, that "had Dana Byrd testified she would have testified to [Victim] having a real problem telling the truth.  She would have testified about where [Byrd] lived * * * in August 2009.  She would have testified as to where her son slept – there was an issue about that in this case.  And that's what the evidence would have shown had she testified."  Trial Tr. at 255.

{¶96}    Much of the evidence Byrd sought to introduce through Dana's testimony was cumulative of other evidence at trial.  As mentioned above, the jury was aware of Victim's credibility issues.  Additionally, the jury heard evidence regarding where Byrd lived in August 2009.  Opal Collier managed the Lawson St. apartment where Byrd lived and allegedly committed the crimes in question.  Collier testified that Byrd's lease for the Lawson St. apartment began on September 1, 2009.  Moreover, Ashley Damron testified that Byrd was one of her best friends, and it was her understanding that, in August 2009, Byrd lived "[w]ith his wife, Dana."  Trial Tr. at 267.  Damron also testified that Byrd "moved [into his Lawson St. apartment] between September 1st and September 3rd of 2009."  Id.  Both Collier and Damron testified on Byrd's behalf.  Presumably, Byrd would not have sought testimony from Dana that would have undermined the testimony of Collier and Damron.  Thus, testimony by Dana regarding where Byrd lived in August 2009 would have been cumulative of other evidence before the jury.

{¶97}    Additionally, the Supreme Court of Ohio has held that "error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt."  *State v. Williams* (1983), 6 Ohio St.3d 281, at paragraph six of the syllabus; *State v. Woods*, Ross App. No. 09CA3090, 2009-Ohio-6169, at ¶27; *Arnold* at ¶10.  And the record is clear that there is overwhelming proof of Byrd's guilt.  Specifically, Byrd's own words led to his convictions.  The recorded phone call and the conversation that Conner overheard between Byrd and Victim were tantamount to confessions by Byrd.  At trial, Byrd argued that he never explicitly admitted to the acts in question during these conversations.  Byrd, however, did not

deny the conduct that Victim indicated he committed.  For example, Byrd did not deny Victim's implication that Byrd ejaculated on her leg.  Instead, he assured Victim that she could not get pregnant.  Also, during the recorded phone conversation, Victim was clearly talking about sexual activity between Byrd and Victim.  Victim implicated Byrd by stating, "I don't want to lie to [Conner] cause it was you. * * * Like, what should I do?" Trial Tr. at 157.  Byrd's response was not a denial, but instead, Byrd suggested Victim's decision depended on whether Victim wanted Byrd to go to jail or not.  Byrd then assured Victim that their sexual activity was not Victim's fault.

**{¶98}**     Given the subject matter of Victim's statements during the conversations, Byrd's failure to deny Victim's allegations amounted to an adoptive admission.  "An adoptive admission, or an admission by acquiescence, consists of a statement by a non-party which may be deemed to be that of a party by virtue of the failure of the party to deny the statement." *State v. Tolliver* (2001), 146 Ohio App.3d 186, 198, quoting *State v. Vitanza* (Mar. 27, 1992), Lake App. No. 91–L–053, in turn quoting Staff Notes to Evid.R. 801(D)(2)(b).

**{¶99}**     Thus, considering the cumulative nature of Dana's proposed testimony and Byrd's statements to Victim, which were tantamount to a confession, there is no reasonable possibility that the exclusion of Dana's testimony led to Byrd's convictions.

**{¶100}**     Finally, Byrd's trial counsel indicated that where Dana's son slept was an issue at trial.  On appeal, Byrd argues that testimony regarding where Dana's son slept would have shown that "her son slept in a different place than that alleged by the Prosecutor at the time the alleged crimes were committed."  Appellant's Brief at 19-20. Although he does not thoroughly explain the significance of this issue, Byrd suggests

that this testimony would have shown that Byrd "did not even live in the place the alleged rapes occurred[.]" Id. at 20. Again, this evidence would be cumulative of the evidence provided by Collier and Damron. Consequently, we can discern no reasonable possibility that exclusion of evidence of where Dana's son slept led to Byrd's conviction.

**{¶101}** Therefore, the trial court's error during its interrogation of Dana was harmless beyond a reasonable doubt. Accordingly, we overrule Byrd's fourth assignment of error.

VI.

**{¶102}** In his fifth assignment of error, Byrd claims that the trial court erred when it convicted him of both rape and gross sexual imposition. According to Byrd, the two offenses are allied offenses of similar import, which the trial court should have merged. We review de novo whether a defendant's offenses should have been merged as allied offenses of similar import. *State v. Buckta* (Nov. 12, 1996), Pickaway App. No. 96CA3; see, also, *State v. Brown*, Allen App. No. 1-10-31, 2011-Ohio-1461, at ¶36.

**{¶103}** "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). But "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B).

{¶104}    In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Supreme

Court of Ohio articulated the proper analysis for determining whether merger is

appropriate.  "In determining whether offenses are allied offenses of similar import

under R.C. 2941.25(A), the question is whether it is possible to commit one offense and

commit the other with the same conduct, not whether it is possible to commit one

*without* committing the other.  [*State v.*] *Blankenship*, 38 Ohio St.3d [116,] 119[,]

(Whiteside, J., concurring) ('It is not necessary that both crimes are always committed

by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the

same conduct.  It is a matter of possibility, rather than certainty, that the same conduct

will constitute commission of both offenses.'  [Emphasis sic]). * * *

{¶105}    "If the multiple offenses can be committed by the same conduct, then the

court must determine whether the offenses were committed by the same conduct, i.e.,

'a single act, committed with a single state of mind.'  [*State v.*] *Brown*, 119 Ohio St.3d

447, 2008-Ohio-4569[,] at ¶50 (Lanzinger, J., dissenting).

{¶106}    "If the answer to both questions is yes, then the offenses are allied offenses

of similar import and will be merged.

{¶107}    "Conversely, if the court determines that the commission of one offense will

never result in the commission of the other, or if the offenses are committed separately,

or if the defendant has separate animus for each offense, then, according to R.C.

2941.25(B), the offenses will not merge."  *Johnson* at ¶48-51 (emphasis sic).

{¶108}    Only one of Byrd's two rape convictions is relevant for this assignment of

error.  For simplicity, we will refer to Byrd's offenses as either the "August" offenses or

the "December" offenses.[1]  Byrd was found guilty of three counts of gross sexual

imposition, and each count was a December offense.  However, Byrd has one August

rape conviction and one December rape conviction, and only the December rape

conviction is relevant for this analysis.

**{¶109}**    We note that Byrd is serving his gross sexual imposition sentences and his

rape sentences concurrently.  "However, even when the sentences are to be served

concurrently, a defendant is prejudiced by having more convictions than are authorized

by law."  *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, at ¶31.

**{¶110}**    The conduct that led to Byrd's December convictions occurred on two

different occasions.  On the first occasion, Byrd got into bed with Victim, and he took her

clothing off.  He then rubbed her breasts, he ran his hands through her vagina, and he

performed oral sex upon her.  On the second occasion, Byrd removed Victim's clothing,

and he rubbed her breast.  He also rubbed Victim's vagina, and he performed oral sex

upon her.  Byrd then took her hand and made her masturbate him until he ejaculated.

At which point, Byrd ordered Victim to retrieve a towel, so that he could clean up.

**{¶111}**    Even assuming that Byrd's rape and gross sexual imposition offenses could

be committed with the same conduct, they were still committed with a separate animus.

"When a defendant gropes his victim's breast and buttocks, as well as rapes her, * * *

the acts of groping are not merely incidental to the rape, and a trial court does not err in

separately sentencing the defendant for each of the counts of gross sexual imposition

based upon those actions, as well as for the rape."  *State v. Cooper*, Montgomery App.

No. 23143, 2010-Ohio-5517, at ¶24.  See, also, *State v. Foust*, 105 Ohio St.3d 137,

---

[1] The "August" offenses were committed between August 1, 2009, and September 1, 2009, and the "December" offenses were committed between December 1, 2009, and January 3, 2010.

2004-Ohio-7006, at ¶145 ("The two other counts of gross sexual imposition are premised on * * * testimony that [the defendant] had touched [the victim's] breasts and put his fingers on her vagina.  There is no evidence that [the defendant] committed these acts while he was raping [the victim].  We conclude that these acts were distinct and separate from each other and from the rapes, and, therefore, [the defendant] could be convicted of each in addition to the rapes."); *State v. Knight*, Cuyahoga App. No. 89534, 2008-Ohio-579, at ¶48 ("[T]he court properly found that [the defendant] committed gross sexual imposition when he groped the victim's breast and that this was done with a separate animus from the sexual contact that led to the conviction for rape. * * * Accordingly, the trial court did not err in sentencing [the defendant] as to both rape and gross sexual imposition.").

**{¶112}** Byrd's December rape conviction resulted from him performing oral sex on Victim.  On the first occasion in December, there is no evidence that, when Byrd rubbed Victim's breast or ran his hands through her vagina, these acts were done incidental to Byrd performing oral sex upon Victim.  Thus, the acts of gross sexual imposition were committed with a separate animus from the rape.  Additionally, on the second occasion in December, there is no evidence that Byrd rubbed Victim's breast or her vagina incidental to performing oral sex upon Victim.  Thus, similar to the first December offense, the acts of gross sexual imposition were committed with a separate animus from the rape.

**{¶113}** The record is unclear regarding which occasion served as the basis for Byrd's December rape conviction.  That is, there is evidence that would support two rape convictions in December (i.e., two occasions where Byrd performed oral sex on Victim),

but Byrd has only one December rape conviction.  It is clear, however, that regardless of which December occasion served as the basis for the December rape conviction, the December rape was committed with a separate animus from the gross sexual imposition offenses.  Therefore, the trial court did not err by failing to merge Byrd's gross sexual imposition convictions and his rape conviction as allied offenses of similar import.

**{¶114}** Accordingly, we overrule Byrd's fifth assignment of error.

VII.

**{¶115}** In conclusion, we overrule all of Byrd's assignments of error, and we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

Harsha, J., Concurring in Part and Dissenting in Part:

**{¶116}** I concur in judgment and opinion regarding the first four assignments of error even though some present arguably close issues. Any potential errors are harmless beyond a reasonable doubt in light of Byrd's adoptive admissions, e.g. the probability of an expert's testimony changing the outcome is nil. However, I dissent from the majority's resolution of the fifth assignment of error. In my view we cannot conclude Byrd had a separate animus for committing the December rape and gross sexual imposition unless we engage in an exercise of parsing his "conduct into a blow-by-blow." See the plurality opinion in *Johnson*, supra, at ¶ 56, which rightly criticizes such an effort.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED.  Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

McFarland, J.:  Concurs in Judgment and Opinion as to Assignments of Error I through IV; Concurs in Judgment Only as to Assignment of Error V.
Harsha, J.:     Concurs in Part and Dissents in Part with Opinion.


For the Court


BY:_____
      Roger L. Kline, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**