[Cite as *State v. Marcum*, 2013-Ohio-5333.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 12CA6 |
| | : | |
| vs. | : | |
| | : | DECISION AND JUDGMENT |
| RILEY KEITH MARCUM, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | **Released: 11/25/13** |

_____
APPEARANCES:

Timothy Young, Ohio Public Defender, and Francisco E. Lüttecke, Assistant State Public Defender, Columbus, Ohio, for Appellant.

C. Jeffrey Adkins, Gallia County Prosecutor, Gallipolis, Ohio, for Appellee.
_____

McFarland, P.J.

{¶1} Riley K. Marcum appeals his conviction in the Gallia County Court of Common Pleas after a jury found him guilty of complicity to burglary, a felony of the third degree. On appeal, Marcum argues: (1) prosecutorial misconduct deprived him of the constitutionally guaranteed right to a fair trial, in violation of the fifth and fourteenth amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution; and (2) he was rendered ineffective assistance of counsel in violation of his rights under the fifth, sixth, and fourteenth amendments of

the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. Upon review, we find no prosecutorial misconduct occurred and that Appellant was not denied effective assistance of counsel. Accordingly, we overrule both assignments of error and affirm the judgment of the trial court.

## FACTS

{¶2}  Riley K. Marcum, "Appellant", was indicted for burglary, a violation of R.C. 2911.12(A)(3), by the Gallia County Grand Jury on September 24, 2010.   Appellant, who resided in West Virginia, was a friend of Gerald Haffelt of Gallia County, Ohio, and the two shared an appreciation for valuable collector guitars. On or about April 23, 2009, while Haffelt and his wife Doris were out of town, their daughter reported several guitars stolen from her parents' residence. Appellant had prior knowledge of Haffelt's collection, and that the Haffelts would be out of town.  Appellant and others were suspected of burglarizing the Haffelt residence. Appellant eventually proceeded to a jury trial and was convicted of complicity to burglary on March 31, 2012.

{¶3}  At trial, the State presented testimony from Teresa Lee, the Haffelts' daughter, who testified her parents left on a trip to Indiana on April 23, 2009.  She checked on their house and fed their animals on the evening

of April 23, 2009, around 8:30 p.m. and found nothing amiss. When she returned to check their residence the next day, April 24, 2009, at approximately 11:30 a.m., a basement storm window had been moved aside and the screen cut. Several guitars were missing. Lee notified the police and her parents.

{¶4} Gerald Haffelt testified at the time of trial, he had known Appellant for approximately 5 years. He and Appellant had played, bought, and traded guitars. Haffelt had owned over 200 vintage guitars in his lifetime, and considered himself a collector. Haffelt's guitars were lined up on his basement floor with tags identifying the type of guitar. He also had the values marked in the guitar cases. On the Friday before the guitars were taken, Appellant had been at Haffelt's home in Gallia County. Haffelt testified that following Appellant's Friday visit, Appellant called wanting to come back and show Haffelt another guitar. Haffelt testified he told Appellant he was going out of town and could not meet with him. On cross-examination, Haffelt admitted he did not see Appellant take the guitars.

{¶5} Lt. Brian Michael Brown of the West Virginia State Police testified he was requested to investigate the locations of some guitars stolen from Gallia County, Ohio. Brown eventually interviewed Appellant, who

advised he obtained 2 guitars, a Blue Ridge and a Sam's, in a swap for cash or guns.   The investigation continued for a three-year period.  Josh McCoy and Steven Marcum[1] were also investigated.   Brown was also present during a monitored phone call which was placed from Steven Marcum to Appellant.   Brown admitted in cross-examination that he could not recall if the recovered guitars had serial numbers on them, and that he relied on the victim for identification of the property.

{¶6}   The State also presented testimony from Josh McCoy, a resident of West Virginia.  McCoy acknowledged he had previously been sentenced for burglary in the matter.  McCoy testified he had known Appellant most of his life.   McCoy testified Appellant approached him about "getting some guitars."  Appellant offered McCoy $2,500.00 to find assistance.   McCoy was not told where they would obtain the guitars.   McCoy talked to Steven Marcum and Kevin Runyons, who agreed to help.   A week later, the four met at a hot dog shop on Route 64 in West Virginia, and got into Steven Marcum's Chevrolet Silverado extended cab pickup truck.   From there, they followed Appellant's directions to get to the Haffelt residence. Once there, Appellant, McCoy, and Runyons got out of the truck.  Appellant and Runyons broke a basement window and went into the house. In a few

---

[1] The familial relationship between Appellant and Steven Ray Marcum is unclear. Both testified to being related by marriage.

minutes, they were handing guitars out the window. McCoy placed the guitars next to a building. [2]  When Steven Marcum returned, the group placed the guitars in the back of the truck and returned to the hot dog shop, where they separated.  McCoy testified Appellant took the guitars with him that night.  A month later Appellant and McCoy went to Appellant's father's house in Columbus, Ohio, picked up the guitars, and brought them back to West Virginia.  The serial numbers had been removed from the guitars. The night of the burglary, Appellant gave McCoy $500.00, which he shared with Marcum and Runyons.

{¶7}  McCoy acknowledged on cross-examination that the group met after dark, around 9:30 or 10:00 p.m. on the night of the events, and he was not even sure of the actual date of the crime.  He testified Appellant crawled through the window first.  Gloves were used. McCoy also admitted his testimony was given pursuant to a plea agreement in his own criminal case. McCoy testified six to eight guitars were taken from the residence.

{¶8}  Steven Ray Marcum also testified on behalf of the State of Ohio. Marcum testified he resides in Kentucky and is employed as a truck driver. He testified Josh McCoy initially contacted him.   McCoy and Appellant later came to his house and asked him if they could use his pickup truck to

---

[2] On cross-examination, McCoy testified he placed the guitars against a tree.

move some items they had bought or traded.   Marcum testified he would not

loan his truck so he decided to drive them.  Later, McCoy, Appellant, Kevin

Runyons and he met at the hot dog stand[3] between 9:00 and 10:00 p.m., after

dark, and the others got in his vehicle.  Nobody talked during the trip, but

Appellant directed Marcum to the Haffelt residence in Ohio.  No one else

gave Marcum any direction. Marcum testified he "knew something was

wrong" when they asked him to stop in the middle of the road instead of

pulling into the driveway.  Marcum let the others out of the truck, and they

walked across a field.  He drove further up the road, turned around, and

returned.  Marcum testified he never exited the truck. When he picked up the

others, they put items (which he later learned were guitars) into the back of

his truck. Marcum testified he knew nothing about how the others entered

the Haffelt residence. Josh McCoy gave Marcum $200.00 for hauling the

guitars in his pickup.

{¶9}  Marcum testified he later spoke to a couple of troopers

investigating the missing guitars. He told them exactly what he had done and

agreed to contact Appellant and record him. During the recorded call,

Appellant responded that "he tried to make him and Josh some money and

Josh was trying to mess him over."

---

[3] Marcum testified the hot dog stand was on Route 52.  McCoy's testimony indicated the hot dog stand was on Route 64.

{¶10} The testimony of Gallia County Sheriff's Deputy Thomas Glen Wright, Doris Haffelt, and Deputy Fred Workman also supported the State's case. Wright testified he took Teresa Lee's call, responded to the scene, and saw the broken window. When he realized a burglary was involved, he contacted a detective with the Sheriff's department. Doris Haffelt testified her husband owned approximately 75-90 guitars at the time of the burglary. The ones taken were all Martin guitars, except for two which were a Blue Ridge and a Sam's. She testified neither she nor her husband had misplaced the guitars, prior to leaving for their trip. Deputy Workman testified he worked with the West Virginia troopers to track down the stolen guitars. They eventually contacted Steven Marcum and interviewed him about the incident. Workman was present when Marcum made the monitored call to Appellant on July 6, 2010.

{¶11} The trial transcript indicates at this point, the recorded phone call was played for the jury. However, it does not appear the recording was made an exhibit when the State offered its other exhibits. The recording is not provided with the record on appeal. Regarding the phone call, Deputy Workman testified he gave Steven Marcum a script of questions to ask Appellant. Deputy Workman testified Appellant admitted buying guitars from Josh McCoy. Appellant also stated McCoy stole the guitars.

Workman testified Appellant never admitted to stealing the guitars himself. On redirect, Workman testified he heard Steven Marcum accuse Appellant of "coming across the field, helping carry guitars back," and he never heard Appellant deny the accusation. The State then rested.

{¶12} The Defense's case began with testimony from Appellant's wife, Lori Marcum ("Lori"). Lori testified on April 23, 2009, Appellant, she, and their two children went to his family's house in Breeden, West Virginia. Appellant was going to do some landscaping for his aunt, Violet White. Lori testified Appellant was with them all day, and the only time he left was approximately 90 minutes in the evening, when he went to Lowe's.

{¶13} Lori testified Appellant and their family returned home around 11:00 p.m. and they went to bed. Lori testified she is a "light" sleeper and Appellant was with her all night. On April 24, 2009, Josh McCoy and Steven Marcum knocked on the door between 5:00 a.m. and 6:00 a.m. and brought in 5 or 6 guitars. Appellant looked at the guitars, but did not keep them. He helped the others back to their vehicle with the guitars and went back to bed. Later that day, Appellant and his family went to his church fundraiser. Appellant played music at church that night. Lori reiterated between Wednesday night (April 22, 2009) and Saturday (April 25, 2009),

Appellant was never away from her for more than the 90-minute trip to Lowes.

{¶14}  Violet White ("White") testified Appellant is her nephew. Appellant arrived at her home in West Virginia around 10:00 a.m. on Thursday, April 23, 2009.  He worked all day landscaping and was there until 8:00 p.m.  White and Appellant went to Lowe's and returned around 9:00 p.m. or 10:00 p.m.  Appellant and his family left around 11:00 p.m. White saw Appellant at church at noon the next day.  He stayed until late in the evening. White testified it is a three-hour drive from her home in West Virginia to Gallipolis.  At no time on April 23, 2009, was Appellant gone for a six-hour period of time.

{¶15}  Maxie Collins, also a West Virginia resident, testified for the defense.  Appellant is also her nephew.  Ms. Collins testified she coordinated the church activities Appellant and his family attended on April 24, 2009. She also saw Appellant at White's house on April 23, 2009.  Collins testified Appellant was never gone for a six-hour period of time during that day.

{¶16}  Sharon Stafford, another relative of Appellant's, testified she has known Appellant his entire life. Stafford also saw Appellant landscaping at White's house on the April 23, 2009. She arrived around noon and left at

8:30 p.m. Appellant was present the entire time. Stafford also saw him at the church activities on Friday, April 24, 2009.

{¶17} Appellant's mother and step-father, Sharon and Bruce Harris, testified on his behalf. Sharon Harris testified she was present at White's house on April 23, 2009, helping with the landscaping. She arrived at White's house after 4:30 p.m. and worked outside with Appellant until after dark, 9:00 or 9:30 p.m. After that, Appellant came to her house and stayed until approximately 11:00 p.m. She also saw Appellant at the church activities the next day. He stayed the entire time and never left for any long absences. The substance of Bruce Harris's testimony was that he recalled seeing Appellant at White's house on April 23, 2009 and at the church activities on the evening of April 24, 2009.

{¶18} Finally, Appellant testified. After graduating from high school, Appellant joined the National Guard and completed basic training. His current rank is E4 specialist. Appellant has also worked as an underground coal miner and a railroad conductor. In April 2009, Appellant lived in Williamson, West Virginia, almost three hours from Gallia County.

{¶19} Appellant testified he was given "Jerry" Haffelt's name in 2006. After Appellant and Haffelt initially talked on the phone, they sometimes met in Huntington, West Virginia, a halfway point for both men,

to buy or trade guitars. Appellant had been to Haffelt's house approximately 15-20 times.

{¶20}  Appellant took Josh McCoy to the Haffelt residence in 2008. Appellant testified McCoy was not interested in guitars, but he was trying to help McCoy, who was in a "bad situation" and "had been on drugs". Appellant "hung out" with McCoy.

{¶21}  In February 2009, Appellant and his wife went to the Haffelt house and bought a guitar.  Around March 20, 2009, Appellant and his family returned to the Haffelts to sell the guitar back to Jerry.  Appellant explained  he had gotten laid off from the railroad and his wife was in school, so they needed money.

{¶22}  Appellant denied involvement in the robbery. As to his whereabouts during the relevant time frame involved, Appellant testified he and his wife went to West Virginia on April 23, 2009, to help his aunt, Violet White, with landscaping at her home.   He left to go to Lowe's with his aunt.  After they returned, Appellant had dinner with family.  He did not go anywhere after he went home.

{¶23}  In the early hours of April 24, 2009, between 4:30 a.m. and 6:00 a.m., Josh McCoy and Steven Marcum came to his apartment. They showed him 6 Martin guitars they had. Appellant testified he did not ask

where they came from because "I knew right away where they got the guitars." He knew the guitars were vintage. Appellant testified he told them to get the guitars out of his house.

{¶24} Appellant testified McCoy had a Blue Ridge and a Sam's guitar. McCoy arranged a sale of the Blue Ridge guitar. A week later, Appellant was with McCoy when he was arrested by West Virginia State Troopers. Appellant later turned over the guitar he had to Trooper Brown.

{¶25} Appellant denied riding with the others to the Haffelt's house in Gallipolis, giving Marcum directions to the Haffelt's residence, taking anything from the Haffelt residence, or directing anyone else to do so. He denied leaving the State of West Virginia on April 23, 24, and 25, 2009. Appellant testified McCoy had the guitars. He denied telling McCoy how to sell them, how to get rid of them, or who might buy them. Essentially, he testified it is his belief the others brought the guitars to his house because they did not know anyone else who was knowledgeable about guitars.

{¶26} Appellant does not know what happened to the other Martin guitars. He was questioned approximately two weeks after the incident. He was contacted by West Virginia State Troopers and gave permission to search his home. Several weeks later he was arrested for receiving stolen property in West Virginia, in connection with Josh McCoy and the Blue

Ridge guitar.  Appellant testified he has cooperated with law enforcement in West Virginia and Ohio. [4]

{¶27} On cross-examination, Appellant testified he at one time thought of Jerry Haffelt as an "extra father."  He admitted when the stolen guitars were shown to him, he did not notify law enforcement.

{¶28} The jury subsequently found Appellant guilty of complicity to burglary.  He was sentenced to 30 months in prison and ordered to pay restitution to Gerald Haffelt in the amount of $42,450.00. This timely appeal followed.

ASSIGNMENTS OF ERROR

I. PROSECUTORIAL MISCONDUCT DEPRIVED RILEY K. MARCUM OF THE CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION. (Tr. 204, 341, 415, 429-430, 440-441, 525-527, 538-539)

II. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF MR. MARCUM'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATE CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION. (Assignment of Error I; Statement of the Case and Facts).

---

[4] Appellant testified he agreed to wear a wire and record Steven Marcum and Josh McCoy, but was never given the opportunity to do that.  He also testified the case in West Virginia was later dismissed. Appellant also testified he turned over the guitar he had to Trooper Brown.  It was later clarified this was pursuant to the trooper's request, and not of Appellant's own volition.

ASSIGNMENT OF ERROR ONE

{¶29}  Appellant contends he was denied a fair trial by the cumulative error stemming from the State's numerous improper suggestions, statements, and arguments.  Appellant cites these errors occurring at pages 204, 341, 415, 429-430, 440-441, 525-527, and 538-539 of the transcript.  However, Appellant failed to object to the alleged improper suggestions, statements, and arguments at trial.  Therefore, we review the alleged errors under the standard set forth regarding plain errors.

A.  STANDARD OF REVIEW

{¶30}  Failure to object to an alleged error waives all but plain error.  *State v. Keeley,* 4th Dist. No. 11CA5, 2012-Ohio-3564, 2012 WL 3194355, ¶ 28.  Notice of CrimR. 52(B) plain error must be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.  *State v. Rohrbaugh,* 126 Ohio St.3d 421, 934 N.E.2d 920, 2010-Ohio-3286, at ¶ 6; *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), at paragraph three of the syllabus.  To find plain error, the outcome of trial clearly would have been otherwise.  *State v. McCausland,* 124 Ohio St.3d 8, 918 N.E.2d 507, 2009-Ohio-5933, at ¶ 15; *State v. Braden,* 98 Ohio St.3d 354, 785 N.E.2d 439, 2003-Ohio-1325, at ¶ 50.

## B. LEGAL ANALYSIS

**{¶31}** "The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether the rights of the accused were materially prejudiced." *State v. Purdin,* 4th Dist. No. 12CA944, 2013-Ohio-22, 2013 WL 84897, ¶ 31, quoting St*ate v. Leonard,* 4th Dist. No. 08CA24, 2009-Ohio-6191, ¶ 36, *citing State v. Smith,* 97 Ohio St. 3d 367, 780 N.E. 2d 221, 2002-Ohio-6659, ¶ 45, in turn citing *State v. Smith,* 14 Ohio St. 3d 13, 14, 470 N.E. 2d 883 (1984). "The 'conduct of a prosecuting attorney during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial.'" *Purdin, supra,* quoting *State v. Givens,* 4th Dist. No. 07CA19, 2008-Ohio-1202, ¶ 28, quoting *State v. Gest,* 108 Ohio App. 3d 248, 257, 670 N.E. 2d 536 (8th Dist. 1995). *Accord State v. Apanovitch,* 33 Ohio St. 3d 19, 24, 514 N.E. 2d 394 (1987). "Prosecutorial misconduct constitutes reversible error only in rare instances. *"Purdin, supra,* quoting *State v. Edgington,* 4th Dist. No. 05CA2866, 2006-Ohio-3712, ¶ 18, citing *State v. Keenan,* 66 Ohio St. 3d 402, 406, 613 N.E. 2d 203 (1993). The "touchstone analysis* * * is the fairness of the trial, not the culpability of the prosecutor. * * * The Constitution does not guarantee an 'error free, perfect trial.'" *Purdin, supra,* quoting *Leonard* at ¶ 36, quoting *Gest* at 257.

{¶32}  We begin with Appellant's claim the State engaged in prosecutorial misconduct in closing by highlighting the fact Steven Marcum made serious accusations against Appellant in the recorded telephone call, which Appellant did not deny. Appellant argues the prosecutor referred to the "adoptive admission" exemption to hearsay, codified at Evid. R. 801(D)(2)(b).  Appellant contends that adoptive admissions are nonhearsay and go to the admissibility of such an admission, but do not establish a permissible or mandatory inference, or go to the weight of the admission or nonstatement.  Appellant notes the recording was introduced through the officer who set up the call and both Appellant and Steven Marcum testified. There was no objection to the recording's admissibility and, as such, the "adoptive admission" exemption to hearsay was never made an issue. Appellant argues the prosecutor instructed the jury on what conclusions of law must be made from a denial or silence and that to do so was both an incorrect statement of law and inappropriate.

{¶33}  In commenting on Appellant's failure to deny the accusations, the prosecutor stated:

> "Now what that is, is in, in the law there's something called an adoptive initiative.  If you are accused of something or a reasonable person would deny it and you fail to deny it and you on the next subject or you act like it didn't happen then you are, that third parties statement becomes your own statement."

**{¶34}** We recognize the following law regarding the "adoptive admission" or "admission by acquiescence":

> "It is well-settled that '[a]n accused person may incriminate himself not only by his direct statements, but also by declaration so or conduct by which he impliedly admits the truth of charges made against him. Thus, silence in the face of an accusation of crime may constitute conduct or circumstances from which his admission of guilty may be inferred. When a statement tending to involve one in the commission of a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny it are admissible against him as evidence of his acquiescence in its truth. His conduct constitutes what is known as a tacit or silent or adoptive admission.' *State v. Brown* (June 9, 1987), Columbiana Dist. No. 85-C-42; see, also, *State v. Gibson,* 2nd Dist. No. 09-CA-05, 2010-Ohio-1121, ¶ 15-16."

**{¶35}** "An adoptive admission, or an admission by acquiescence, consists of a statement by a non-party which may be deemed to be that of a party by virtue of the failure of the party to deny the statement. *State v. Byrd,* 2012-Ohio-1138, ¶ 98, quoting *State v. Tolliver,* 146 Ohio App. 3d 186, 198 (2001), quoting *State v. Vitanza* (Mar. 27, 1992), Lake Dist. No. 91-L-053, in turn quoting Staff Notes to Evid. R. 801(D)(2)(b).

**{¶36}** We do not agree with Appellant's argument. The State concedes its rendition of the concept of "adoptive admission" was inartful. Upon review of the transcript, we find the State's characterization of Appellant's statement on the recorded conversation was fair. Appellant and

Marcum were discussing Josh McCoy and the guitars. Appellant admitted buying the guitars from McCoy. Appellant also indicated McCoy was trying to "mess him over." Appellant heard Marcum's statement on the recording that Appellant "came back across the field with the guitars." Appellant is a high school graduate, spent time in the military, and worked as a conductor on the railroad. He reasonably could understand the implication of Marcum's statement that Appellant carried the guitars. Appellant reasonably could have been expected to deny Marcum's statement if it were untrue. Although the prosecutor's summarization of the legal concept of "adoptive admissions" was simplistic, we cannot say it was an incorrect statement of the law or inherently unfair.

{¶37} In his next argument, Appellant begins by acknowledging that witness credibility was paramount in his trial. The outcome of his trial hinged on which version of the burglary, which witnesses the jury believed. The weight to be given evidence and the credibility to be afforded testimony are issues to be determined by the trier of fact. *State v. Frazier,* 73 Ohio St. 3d 323, 339, 1995-Ohio-235, 652 N.E.2d 1000, citing *State v. Grant,* Ohio St.3d 465, 477, 1993-Ohio-171, 620 N.E.2d 50. The fact finder "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the

proffered testimony." *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶38} "Prosecutorial misconduct rises to plain error only if it is clear that a defendant would not have been convicted in the absence of the improper comments." *Purdin, supra* at ¶ 39, quoting *State v. Keeley,* 4th Dist. No. 11CA5-2012-Ohio-3564, ¶ 28, citing *State v. Conley*, 4th Dist. No. 08CA784, 2009-Ohio-1848; *State v. Olvera-Guillen,* 12th Dist. No. CA2007-05-118, 2008-Ohio-5416, ¶ 36.

{¶39} Appellant takes issue with the prosecutor's remarks, bolstering the credibility of Josh McCoy and Steven Marcum, in opening statement as follows:

> "You will hear evidence in this case that there have been conviction in this case. Uh, Josh McCoy has already entered a plea of guilty and has been sentenced in this matter. Uh, he has accepted his responsibility in this. Uh, I ask you to remember that in your testimony, in your, hearing his testimony he, he feels bad about it. He realized he shouldn't have, but he has done that. Uh, Steven Marcum is also here testifying voluntarily. Um, Mr. Marcum has been charged with this offense uh, but he has not been convicted. But he feels, I think you'll hear, examine, him that's (sic) its time to do the right thing. He didn't do it on April the 23rd or around that time three years ago, he's been insisting on doing it despite the consequences and that's why we're here today."

We see nothing impermissible about the prosecutor's opening

remarks calculated to bolster the credibility of the State's witnesses.  The prosecutor acknowledged McCoy had been sentenced and Marcum had been indicted in criminal cases stemming from the April 2009 theft in Gallia County of Haffelt's guitars. McCoy and Marcum were Appellant's co-defendants.  The prosecutor was preemptively attempting to lessen the impact of these facts which would no doubt be brought up in cross-examination. This bolstering is not prosecutorial misconduct.

{¶40}  Appellant notes the prosecutor further attempted to bolster the credibility of Josh McCoy on redirect when he noted that McCoy's plea agreement was not just to testify but "to testify truthfully: even to "some of [the] things you don't remember[.]"  The prosecutor clarified that McCoy's testimony was not some rote act pursuant to the plea entered in his own criminal case, but truthful testimony. Although it is unclear what the prosecutor meant by a testifying to "events he did not even remember" we see nothing impermissible in the prosecutor's bolstering of this witness.

{¶41}  Appellant also argues the prosecutor undercut the credibility of Appellant's witnesses, implying that Appellant's family colluded to create an alibi for him, and set the groundwork for his improper closing remarks. Specifically, Appellant points to the following exchanges:

On recross of Lori Marcum at page 415:

Q.  You say you've prepared for your testimony here today, right?

A.  No, I didn't say that. I said that…

Q.  You've had plenty of time to prepare for your testimony here today, is that correct?

A.  I guess, this is the first time I've ever…

Q.  Thank you very much for that answer.  That's all I have Judge.

Again, although the prosecutor's questioning was suggestive and aggressive, we see nothing unfair in the strategy.

On cross-examination of Maxie Collins at 429:

Q.  Um, have you, you've prepared for your testimony here today, right?

A.  Um, what do you mean prepared?

Q.  You've…Well let me strike that question.

Appellant argues this exchange preceded questions as to Mrs. Collins' memory of dates in 2008, 2010, 2011.  Similarly, we see nothing unfair about the prosecutor's implication about the witness's ability to remember significant dates.

{¶42}  Appellant continues to argue the prosecutor improperly "set up" his closing remarks by the following exchanges with Sharon Stafford, Appellant's mother at 440-441:

Q.  […]Um, you've talked with others to prepare your testimony here today haven't you?

A.  No, I've…

Q.  So you've, you've not talked to anybody in the hallway?

A.  I talked, but I don't talk about …

Q.  Did you talk about what you're going to testify to?

A.  No, no.

Q.  Nobody did that, right?

A.  I didn't.

Q.  Okay[.]

{¶43}  Appellant contends the prosecutor's accusations and implications were improper impeachment, witness intimidation, and vouching were improper.  Upon review of the transcript, we see nothing unfair about the prosecutor's aggressive cross-examination of the defense witnesses.  The prosecutor never accused these witnesses of lying for Appellant. These witnesses all supported Appellant's alibi that he did not leave West Virginia April 22, 2009 – April 25, 2009. The prosecutor did

aggressively inquire as to their remembrances of the events on April 23 and 24, 2009 in an attempt to undercut their credibility.  He also undercut their credibility by reminding the jury that nearly all of the witnesses were Appellant's close relatives. The State's challenges to the accuracy and veracity of these witnesses was permissible and did not constitute prosecutorial misconduct.

{¶44}  Appellant submits by the end of the prosecutor's rebuttal, he injected himself into the jury box by using "we."   Appellant points to these remarks:

> The prosecutor's rebuttal at pages 538-539:
>
> "And let's talk about a, the witnesses called by the defense, many of them. Um, they pretty much all said the same thing didn't they?
>
>     * * * *
>
> A little inconsistency would have been, I think, better for credibility that the standard pat response that they give, that they gave you.  I think that suggest uh, they're all close friends, they're relatives of the defendant that maybe they got their stories straight before they came up here.
>
>     * * * *
>
> They claim that this is something they remember with awful good precision.  I bet there's probably not a one of you can tell me what you were doing at some random date three years ago. And, that to me shows that they're telling one story.  It's not what happened.  That's, that's part of what you're able to do and required to do when you assess somebody's credibility.  It is to test that against how normal people react.  and needless to say their motives are certainly the kind we all understand, but

the kind as a jury we ought to suspect.  They're relatives,
they're friends, they care about him."

**{¶45}** We must "view the State's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." *Purdin*, at ¶ 37, quoting *State v. Treesh*, 90 Ohio St. 3d 460, 739 N.E. 2d 749 (2001), citing *State v. Moritz,* 63 Ohio St. 2d 150, 157, 407 N.E. 2d 1268 (1980). "The prosecution is normally entitled to a certain degree of latitude in its closing remarks." *Purdin, supra,* quoting *Smith,* 14 Ohio St. 3d at 13-14, 470 N.E. 2d 883, citing *State v. Woodard,* 6 Ohio St. 2d 14, 26, 215 N.E. 2d 568 (1966); *State v. Liberatore,* 69 Ohio St. 2d 583, 589, 433 N.E. 2d 561 (1982).  A closing argument that sets forth reasons "to deem * * * testimony * * * unreliable does not amount to the prosecutor giving a [personal] opinion." *Topping, supra* at 86, quoting *State v. Williams,* 8th Dist. No. 97039, 2012-Ohio-1741, ¶ 19.  Instead, "it merely invites the jury to weight the credibility." *Williams, supra* at ¶ 19; *Topping,* at 86.

**{¶46}** Here, the prosecutor should have refrained from identifying himself with the jury by the use of "we."  However, we cannot say that it is clear Appellant would not have been convicted in the absence of the prosecutor's remarks. The prosecutor suggested reasons why the defense witnesses were unreliable and invited the jury to weigh their credibility.

Further, the transcript reflects the jurors had ample circumstantial evidence to support its verdict of guilty.

**{¶47}** "[D]irect evidence of a fact is not required. Circumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence. " *State v. Lott,* 51 Ohio St. 3d 160, 555 N.E. 2d 293 (1990), citing *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S. Ct. 6, 10 (1960), citing *Rogers v. Missouri Pacific RR Co.,* 352 U.S. 500-508, fn 17, 77 S. Ct. 443, 449, fn 17 (1957). Even murder convictions and death sentences can rest solely on circumstantial evidence. *State v. Apanovitch*, 33 Ohio St. 3d 19, 514 N.E. 2d 394 (1987); *State v. Nicely,* 39 Ohio St. 3d 147, 151, 529 N.E. 2d 1236 (1988).

**{¶48}** The circumstantial evidence demonstrated that Gerald Haffelt and Appellant had formed a friendly, likely trusting relationship. Haffelt had informed Appellant that he would be out of town during the time period when the burglary occurred. Appellant's own testimony demonstrated his familiarity with Haffelt's residence and the location of the guitars. The testimonies of Josh McCoy and Steven Marcum directly implicated Appellant as a participant, if not the mastermind of the crime.

**{¶49}** Teresa Lee's testimony demonstrated that the burglary had to have taken place between 8:30 p.m. on April 23, 2009 and 11:30 a.m. on

April 24, 2009.  The witnesses who testified for Appellant, as to his whereabouts during the relevant time frame, included his wife, parents, and other relatives. There were no independent witnesses on Appellant's behalf. The defense witnesses' testimony as to Appellant's whereabouts was rather general. No one really pinpointed the time Appellant left to go to Lowe's. No one brought in receipts to strengthen the claim that Appellant was there. Appellant's wife Lori was the only witness to support his claim that he was home the entire night of April 24, 2009.

{¶50}  Appellant testified he had taken his wife and family to the Haffelts.  He also took Josh McCoy, with his drug problem, as "something to do."  It could easily be theorized that Appellant took his family with him to the Haffelts in order to further curry favor and trust by using his wife and children, as well as taking McCoy with him at an earlier time to familiarize him with the guitars and the residence.  The jury also heard the recorded conversation between Appellant and Steven Marcum, in which Appellant did not deny he was "walking across the field with the guitars".

{¶51}  The jury also heard Appellant and his wife testify that the others brought the guitars to his house on the morning of April 24, 2009. It is conceivable that Appellant added this fact as a way of admitting some culpability, although to a lesser degree. And the jury heard Appellant

describe Gerald Haffelt as an "extra father," while failing to assist Haffelt or the authorities in solving the crime or returning the property when the others allegedly brought the guitars to his apartment. It appears that here, the jury did not find Appellant or his witnesses to be credible. We will not substitute our judgment for that of the jury under these circumstances. We find no error, let alone plain error.

{¶52} Appellant also argues the prosecutor's tactical attacks on defense witness credibility and the bolstering of its witnesses credibility, cumulatively deprived Appellant of a fair trial. Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Jackson,* 4th Dist. No. 11CA20, 2012-Ohio-6276, 2012 WL 6761891, ¶ 51, quoting *State v. Garner,* 74 Ohio St. 3d 49, 64, 656 N.E. 2d 623 (1995).

{¶53} In this case, we disagree with Appellant's "cumulative-error" argument. We have found no instances of prosecutorial misconduct. Having done so, "[if] a reviewing court finds no prior instances of error, then the [cumulative error] doctrine has no application." *Jackson, supra* at 54,

quoting *State v. McKnight,* 4th Dist. No. 07CA665, 2008-Ohio-2435, 2012 WL 2024076, ¶ 108.

**{¶54}** As one final consideration, we would note that the trial court gave preliminary jury instructions in which he advised the jury that opening statements are not evidence and that the attorneys involved were not witnesses. The trial court explicitly stated "[Y]ou must not consider as evidence any statement of any attorney made during trial." In closing instructions, the trial court again advised that "evidence" does not include the opening statements or closing arguments of counsel, that those remarks are only designed to assist. A jury is presumed to follow the instructions of the trial court. *State v. Hancock,* 108 Ohio St. 3d 57, 840 N.E. 2d 1032 (2006), ¶ 86-87. We are not convinced the prosecutor's remarks constituted misconduct or deprived Appellant of a fair trial. Even if some of the prosecutor's comments bordered on improper, we must presume the jury followed the instructions given to it by the trial court.

**{¶55}** For the above reasons, we affirm the judgment of the trial court and overrule Appellant's first assignment of error.

### ASSIGNMENT OF ERROR TWO

**{¶56}** As Appellant's final assignment of error, he incorporates

his argument assignment of error one and specifically contends his counsel rendered ineffective assistance by failing to object to the prosecutor's misconduct and procure curative instructions regarding each alleged instance of misconduct. For the reasons which follow, we disagree.

## A. STANDARD OF REVIEW

{¶57} Criminal defendants have a right to counsel, including a right to the effective assistance from counsel. *McMann v. Richardson,* 397 U.S. 759, 770, 90 S. Ct. 1441 (1970); *State v. Stout,* 4th Dist. No. 07CA5, 2008-Ohio-1366, ¶ 21. To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052 (1984); *State v. Issa,* 93 Ohio St. 3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006 Ohio-2815, 848 N.E.2d 810, ¶ 95 (citations omitted). "Failure to establish either

element is fatal to the claim." *State v. Jones,* 4th Dist. No. 06CA3116, 2008-Ohio-968, ¶ 14. Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal,* 87 Ohio St. 3d 378, 389, 721 N.E.2d 52 (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

{¶58} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "A properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor,* 4th Dist. No. 07CA1, 2008-Ohio-482, ¶ 10, citing *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Gondor,* 112 Ohio St.3d 377, 2006 Ohio-6679, 860 N.E.2d 77, ¶ 62; *State v. Hamblin,* 37 Ohio St.3d 153, 524 N.E.2d 476 (1988).

{¶59} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that but for counsel's errors, the result of the trial would have been different. *State v. White,* 82 Ohio St.3d 15, 23, 693 N.E.2d 772 (1998); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), at paragraph three of the syllabus. Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be affirmatively demonstrated. See *State v. Clark,* 4th Dist. No. 02CA684, 2003-Ohio-1707, ¶ 22; *State v. Tucker,* 4th Dist. No. 01CA2592 (Apr.2, 2002); *State v. Kuntz,* Ross App. No. 1691 (Feb. 26, 1992).

## B.  LEGAL ANALYSIS

{¶60} Appellant argues the outcome of his trial depended on the jury's assessment of witness credibility and the prosecutor thwarted the jury's task by misstating the legal doctrine pertaining to adoptive admissions. Appellant contends the trial court's failure to object and obtain curative instructions was objectively unreasonable and amounted to deficient performance. Trial counsel's failure to object to alleged instances of prosecutorial misconduct "does not necessarily constitute ineffective assistance" of counsel. *State v. Topping,* 4th Dist. No. 11CA6, 2012- Ohio-5617, 2012 WL 6017986, ¶ 80, citing *State v. Perez,* 124 Ohio St. 3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 230; *State v. Tenace,* 109 Ohio St. 3d

255, 2006-Ohio-2417, 847 N.E. 2d 386, ¶ 62.  That is, a failure to object

does not necessarily fall below an objective standard of reasonableness.

*Topping, supra.*  Instead, a failure to object to alleged instances of

prosecutorial misconduct may be considered sound trial strategy.  *Id*; *State v.*

*Brown,* 5th Dist. No. 2007CA15, 2008-Ohio-3118, ¶ 58 (stating that failure

to object to prosecutor's statements during closing arguments may have been

trial strategy and thus did not constitute deficient performance).

{¶61}  " 'A competent trial attorney might well eschew objecting * *

* in order to minimize jury attention to the damaging material.'"  *Topping,*

*supra,* quoting *State v. Mundt*, 115 Ohio St. 3d 22, 2007-Ohio-4836, 873

N.E. 2d 828, ¶ 90, quoting *United States v. Payne,* 741 F.2d 887, 891 (C.A.

7. 1984).  *Accord. State v. Franklin,* 97 Ohio St. 3d 1, 2002-Ohio-5304, 776

N.E. 2d 26, ¶ 42 (stating that "[a] reasonable attorney may decide not to

interrupt his adversary's argument as a matter of strategy");  *State v. Clay,*

7th Dist. No. 08MA2, 2009-Ohio-1204, ¶ 141 (stating that '[l]imiting

objection during closing is a trial tactic to avoid trying to draw attention to

the statements.").  Thus, in order to establish that trial counsel performed

deficiently by failing to object to error at trial, the defendant ordinarily must

demonstrate that the error "is so compelling that competent counsel would

have been obligated to object to [it] at trial." *Topping, supra.* quoting *State v. Hale,* 119 Ohio St. 3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 233

{¶62} With regard to Appellant's claim that the prosecutor misstated the law as to adoptive admissions, we find it to be reasonable trial strategy not to have objected to admission of the recorded conversation. Initially, Appellant may have wished to have the recording played, in which he cast suspicion on the other parties involved and did not explicitly admit to participation in the crime. Then, in closing, it is reasonable trial strategy not to have wished to call further attention to Appellant's failure to deny the accusation he carried guitars across the field.

{¶63} Appellant also claims it was ineffective assistance to fail to object to the prosecutor's alleged "vouching" for the credibility of Josh McCoy and Steven Marcum. During closing argument, prosecutors "may not express their personal beliefs or opinions regarding the guilt of the accused." *Topping, supra* at 85, quoting *State v. Lott,* 51 Ohio St. 3d 160, 555 NE. 2d 293 (1990). They may also not express their personal beliefs or opinions regarding a witnesses' credibility. *Topping, supra; State v. Williams,* 79 Ohio St. 3d 1, 679 N.E. 2d 646 (1997). "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue. " *Topping, supra* at 85, quoting *State*

*v. Davis,* 116 Ohio St. 3d 404, ¶ 232, citing *State v. Jackson,* 107 Ohio St. 3d 53, 2005-Ohio-5981, 836 N.E. 2d 1173, ¶ 117. The prosecutor is however, permitted to fairly comment upon the testimony and evidence. *Topping, supra; Mundt* at ¶ 119.

{¶64} In this matter, we have already discussed under the first assignment of error our finding that no prosecutorial misconduct occurred when the prosecutor told the jury about McCoy and Marcum's involvement in the crime during opening statement. The prosecutor effectively bolstered his own witnesses without explicitly saying that he found them to be credible. The prosecutor did not improperly vouch for McCoy and Marcum because their involvement in the crime was entered into evidence through their subsequent testimonies. Counsel's performance cannot be deemed deficient for failing to raise non-meritorious objections. *Topping, supra; Mundt,* at ¶ 119.

{¶65} Appellant further argues the prosecutor overtly accused the defense witnesses of conspiring to create an alibi. However, as discussed previously, we find the State's re-cross of Lori Marcum, cross-examination of Maxie Collins, and cross-examination of Sharon Stafford to be aggressive, but fair. The prosecutor did, through his examination of these witnesses, lay the groundwork for his closing theme that the witnesses were

assisting Appellant with an alibi. The prosecutor never called the witnesses liars, he simply pointed out the weaknesses in their testimony and the fact they were relatives. Again, we do not find counsel's performance deficient for failure to raise non-meritorious objections.

{¶66} Finally, Appellant contends the prosecutor unfairly aligned himself with the jury by use of "we" during closing rebuttal. Although this is somewhat problematic, we cannot find it rises to the level of plain error. As we explained in our discussion of Appellant's first assignment of error, ample circumstantial evidence supports Appellant's conviction for complicity to burglary. We do not believe Appellant can show a reasonable probability that, but for counsel's use of "we," the result of the proceeding would have been different. Even if using "we" or other of the prosecutor's comments could be considered to be improper, Appellant cannot show that those allegedly improper comments affected the outcome of the trial. Had counsel lodged objections and/or requested curative instructions at each juncture where, in hindsight, Appellant now feels would have been appropriate, the objection would simply have called attention and perhaps unduly emphasized the content of each instance in the jury's mind. Based on the circumstantial evidence supporting Appellant's conviction, along with the fact that the jurors were in the best position to view the witnesses and

assess credibility, we are not convinced that the outcome of the proceeding would have been different had counsel made the objections and requested curative instructions.  We do not find Appellant was prejudiced by counsel's alleged omissions.

{¶67}  For the reasons discussed above, we do not find Appellant was rendered ineffective assistance of counsel.  We therefore overrule this assignment of error and affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. & Abele, J.: Concur in Judgment and Opinion.

For the Court,

BY: _____

Matthew W. McFarland
Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**